IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 3, 2002 Session

## STATE OF TENNESSEE v. SANDRA KAY WEBB and TABITHA NICOLE WEBB

**Direct Appeal from the Circuit Court for Madison County**
**No. 00-643    Roger A. Page, Judge**

**No. W2001-00447-CCA-R3-CD  - Filed June 24, 2003**

The defendants, Sandra Kay Webb and Tabitha Nicole Webb, were convicted of forty-seven counts of cruelty to animals and each was sentenced to concurrent sentences of eleven months and twenty-nine days for each count, with incarceration for sixty days and a prohibition from either owning animals for ten years.  In addition, the defendants were ordered to pay $39,978.85 in restitution to the Jackson-Madison County Humane Society and to perform fifty hours of community service work, and each defendant was fined a total of $5000.  Soon afterwards, the trial court found that each had possessed animals since their convictions and revoked their community corrections sentences. On appeal, the defendants argue that their convictions should be reversed because the search warrant affidavit was defective, as was its execution; the affiant was untruthful in the affidavit; the animal cruelty statute is unconstitutionally vague; animal shelter records, utilized by the State during the trial, were hearsay and should not have been allowed; the evidence was insufficient, failing to prove either that the defendants acted knowingly or intentionally or failed to provide necessary care; the humane society was not entitled to restitution; the defendants should not have been required to serve their sentences in incarceration or prohibited for ten years from possessing animals; their community corrections sentences should not have been revoked; and the court should not have ordered that their dogs be forfeited.  Following our review, we affirm the judgments of the trial court as to forty-seven of the counts, but remand for entry of a corrected judgment to show that the defendants were acquitted of Count 8 and for an evidentiary hearing as to the payment of restitution.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded for Entry of a Corrected Judgment and for an Evidentiary Hearing as to Restitution**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Angela R. Scott (at trial) and K. Don Bishop (at trial and on appeal), Henderson, Tennessee; Thomas F. Bloom, Nashville, Tennessee (on appeal), for the appellants, Sandra Kay Webb and Tabitha Nicole Webb.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendants were charged with cruelty to animals in a 101-count indictment and were convicted of forty-seven counts according to the verdict forms. However, as the verdicts were announced, the jury foreperson mistakenly stated that the defendants had been found guilty of Count 8 although the form for that count, signed by the foreperson, shows that both were found not guilty. As to Count 8, therefore, we remand for entry of a corrected judgment. The judgments of conviction for the remaining forty-seven counts are affirmed.

### State's Proof

The State's first witness was Gerald Wiltshire, an investigator with the Jackson Police Department Financial Crimes Unit. He said that on April 14, 2000, he had assisted Sergeant Mark Wray of the Madison County Sheriff's Department in executing a search warrant at the defendants' property, 179 Sanderson Road in Mercer, Tennessee. He described the building on the property as "a double wide mobile home-type residence," with three storage rooms behind it and "a dog-type kennel house that had fencing in the back like a dog run on it." Wiltshire described what he saw as he entered the double wide trailer:

> When I went into the front door immediately in – inside the front door on the far wall was a cage with a couple of chocolate-colored dogs in it. And the dogs were covered with a lot of feces.
>
> The property smelled of urine, an ammonia-type smell that was burning your eyes when you made entry in the residence.
>
> Then off to the left there was another cage that had a Doberman[] – what I think was a Doberman Pinscher-looking type puppy in it that had dirty bandages on his ears and a dirty bandage on the tail. And his empty dog bowl where you would put water and food was covered with . . . old and new feces. I mean, it was crusty and things of that nature.
>
> There was another cage, and then in each of the – well, in the first bedroom to the left into the hallway area. There was also a cage in the hallway area. Each of the cages had dogs in it.

The one in the – I believe it was what we called the office where all the computer and the big – their business information was, a dog there had puppies.

In the bedroom off the hallway to the right was two or three large cages that had large animals in it.

The kitchen had a IV bag hanging from the cabinet that went into the sink. And there was the – Where the bedrooms and the office were at was in I would call disarray. I mean, the smell was overwhelming and the – Where the dogs were at, particularly in the living room area when you first walk in the door, those dogs did not appear to be kept well at all.

There were – In the kitchen there was – In one of the refrigerators there was medicine in there that – I don't know what kind of medicine it was.

There was – in the bedroom to the right, the two large cages, there were two dogs in one of the cages. I don't know how long they'd been in there. They didn't appear to be – to have enough room to be in those cages for very long periods of time.

I didn't see any food in any of the cages, any water in any of the cages that I saw.

Investigator Wiltshire said that "most of the cages in the house had two dogs or a dog and puppies, except for the one with the Doberman that had the bandages on his ear[s]." The cages in the living room had what appeared to be metal flooring and those in the bedroom had wire-mesh flooring. He said that all of the cages were dirty with "[a]nimal feces, dog feces, and what I would assume was urine from the smell." In some of the cages in the living room, the feces "was caked onto the food bowl and kind of looked like it had dripped down the side," and [i]t didn't appear . . . to have been cleaned any time recently." He believed that the dogs in these cages could not stand or sit without being in feces and urine.

Investigator Wiltshire also described the kennels on the property:

I saw many what I call kennels. It's where the fencing with the dogs were kept in individual areas. It appeared to have what I call pea gravel on the ground. But on top of that was feces that . . . was at least in some areas three or four inches thick that had turned white already.

The dogs that were housed in those areas – I believe that every dog I saw had ticks on it. Some of the dogs I saw appeared to have eye problems, looked to be infected and things of that nature.

I saw one dog that – While the others were all barking and running back and forth in some of the cages, there were a few dogs that just laid there.

One of them was – I thought at first might have been dead, but he got up eventually. But he wasn't making any noise. And . . . [h]is toenails were all curled over on each other.

And I believe he had quite a few ticks on him and some eye problems, as I recall. Might have been missing an eye or it was swollen shut, I don't remember.

He said that he could smell "the dogs and the stench of the feces." As for the cleanliness of the dogs, he said that "[t]heir feet was [sic] dirty from walking in the feces that was covering the bottoms of the kennels." He did not see food or water in the bowls of any of the dogs kept in the house although that of one of the Dobermans contained a liquid which either was water or urine. Likewise, he did not see water or food in the kennels, although it was possible there was water. He described an additional building located near the outside dog run:

There was a building – outbuilding. It wasn't a storage building, or it may have been used for a storage building that had looks like small areas where puppies were kept and like box-shaped areas, as I recall. It's been a while since I saw it. I don't recall exactly.

He said that the conditions in this building "didn't look too bad," although the dogs were not able to get into the dog runs because the doors were closed and locked.

Concluding his testimony, Wiltshire described the general conditions of the defendants' kennels:

Well, it appeared to me that most of the dogs in the . . . kennels in the woods were walking around in a large amount of feces, new and dried and old feces that was fairly thick. It didn't appear that anybody was cleaning the feces from the cage at all.

And in the . . . residence it didn't appear that the dogs had water or food in the bowls. And I observed some water being poured in the cage where the two . . . chocolate-colored dogs were located inside the front door on the far wall. And the – When the water was poured

into their bowl they were drinking it ravenously I would describe it.

On cross-examination, Wiltshire said that before entering the property to execute the search warrant, a representative of the humane society was present to remove the dogs. He said there was pea gravel on the ground of the kennels as well as a mound of pea gravel near the trailer. He did not recall that the ground within the kennels was muddy. He did not count the dogs that were removed from the property and was not present during the entire removal process.

Charles Roby, the executive field agent for the American Kennel Club ("AKC"), testified that Sandra Kay Webb "was a customer of the American Kennel Club and . . . prescribed to [its] registry." She used the unofficial kennel name Shaolin Kennels, but the name was not registered with the AKC. He said that Tabitha Nicole Webb "was co-owner of dogs owned by her and Sandra Webb," and they represented themselves to the AKC as the proprietors of Shaolin Kennels. He said that the AKC performed "random inspections" to ascertain whether kennels are "in compliance with [AKC] rules and regulations." He said that the AKC first "started attempting to locate the Webbs in July of 1997" in order to conduct a routine inspection. Kennels which register with the AKC "stand to be inspected at any time as a random routine inspection." The AKC had only a post office box number in Jackson as the kennel address, so a "contact letter" was sent to the defendants asking for a physical address so that an appointment for inspection could be made. However, the AKC did not receive a response to the letter. On November 20, 1998, a second letter was sent to the defendants at the post office box, and the AKC subsequently received information that Chester Levy Road in Jackson was the address where the kennel was located. On December 14, 1998, Roby made "an unannounced visit" to the defendants' street address, but found they had moved. He talked with a woman at that address who said she had "lived there about three or four months and the [defendants] were not living there at that time." He said that sometime later the defendants contacted the AKC and gave another address, saying that the location "would be hard to find." He met Tabitha Nicole Webb on February 17, 1999, at a nearby McDonald's restaurant and went with her to a location near Jackson where the defendants resided. He described their residence as "a manufactured home, maybe a double wide" with "a kennel on the outside." As a result from his inspection on that date, he determined that the defendants' kennel was "in compliance with the AKC rules and regulations." Although he had not been back to the defendants' kennel since that time, he had seen on April 25, 2000, the dogs seized from the defendants' property. He said that "some of the dogs had – their eyes were running. Some of them had hair loss; hot spots we call it. There were some sores on the feet pads of some of the dogs." Some of the dogs had cracked paws and some had sores. He had not seen such conditions on any of the dogs he saw at the defendants' kennel on February 17, 1999. He viewed a photograph taken at the defendants' kennel on April 14, 2000, and said that the conditions were different than those he had seen during his visit the previous year.

During cross-examination, Roby agreed that the kennel appeared to be clean, as he visited it, there was no odor or accumulation of dirt or feces. The dogs had both food and water available. When he visited, the defendants had a total of 108 dogs. He said that after the defendants were arrested, he talked by telephone with Jenny Krueger of the Jackson-Madison County Humane

Society and inspected some of the dogs taken from their kennel, although he did not know that the dogs he inspected had been taken from the defendants.

On redirect examination, he said that the defendants' kennel did not appear the same in the photographs taken on April 14 as they had during his visit to the kennel in February 1999. During a visit to Jackson, he observed other animals taken from the defendants' kennel, including a Bull Terrier which was at a veterinarian's office, which he said "had hair loss [and] [h]is feet and nails were in bad condition." He also observed Bull Terriers at a residence in Bolivar.

Ashley Johnson, an investigator with the Madison County Sheriff's Department, testified she had been at the defendants' kennel on April 14, 2000, during the 4 p.m. to 12 a.m. shift. She said that she relieved Deputy Favara and Sergeant Wray left the premises while she was there. She did not recall what deputy had relieved her. She returned to the defendants' premises the following day, the 15th, and observed employees of the humane society loading dogs to take them from the property.

Deputy Jerry Stansell of the Madison County Sheriff's Department testified that when he and his partner, Deputy Fenn, arrived at the defendants' premises, Deputies Pawlowski and Johnson already were there, and he relieved them. He stayed there until "around eight-thirty, maybe eight forty-five the same morning." He was relieved by Deputy Lowery and, he believed, a reserve deputy.

Deputy Robert Fenn testified that he was employed by the Madison County Sheriff's Department and had relieved Deputies Johnson and Pawlowski at the defendants' premises. He was there from approximately 1:00 a.m. until 8:30 a.m., and saw humane society volunteers loading dogs into a van after daylight. He said that he had not made a "tally sheet" of the animals taken from the property or tagged any of them.

Deputy Chad Lowery testified that he was investigator with the Madison County Sheriff's Department and had visited the defendants' premises on a Saturday in April 2000. He had arrived there shortly after 8:00 a.m. and had relieved Deputy Fenn. When he arrived, humane society personnel were loading dogs into dog crates. He identified a log which the sheriff's department had kept, showing the times that various officers had been at the scene. He was relieved by Deputies Ward and Baxter at 12:30 p.m.

Deputy Allen Baxter of the Madison County Sheriff's Department said that he and Deputy David Ward arrived at the defendants' premises around noon and stayed until approximately 5:00 p.m. He observed numerous vehicles of the humane society volunteers and animal control personnel on the premises.

Deputy David Ward testified that he was employed with the Madison County Sheriff's Department and had been at the defendants' property with Deputy Baxter. He identified a "sign-in sheet" that the deputies used that day. He observed humane society personnel removing animals from behind the defendants' mobile home.

Deputy Jason Favara of the Madison County Sheriff's Department testified that he had been to 179 Sanderson with Sergeant Wray and another person "on a Friday in April." He was there for about seven hours and was relieved by Deputy Johnson. He said that his vehicle was "the first car in the gate." He observed the dogs both inside the house and in the kennel in the woods. He said that the dogs in the woods "had no food nor water. The pens were very unsanitary. Also in the house was [sic] the same conditions." On cross-examination, he said that the outside pens had self-feeders. He said that he had not counted the dogs but had helped load them. He and Sergeant Wray had left the premises at the same time. On redirect examination, he said that "[t]he smell in the woods was a very distinct odor of feces and urine. The smell in the residence was a strong smell of ammonia, which was very intolerable, burned your eyes and your throat if you stayed any length of time."

Special Agent Tim Frank of the United States Secret Service testified that he had gone to the defendants' property on April 14, 2000. Describing the condition of the dogs in the house, which he said was "either a trailer-type home or a modular-type home" and in the five or six cages inside, each having one to three dogs, they "were either laying [sic] in or sitting in their own feces and urine that completely littered the bottom of the cages that they were in." Asked to describe the smell inside the house, Agent Frank said:

> [T]here was an odor or stench that was so bad it was unbearable. I mean, you could hardly breathe in there. Your eyes watered.
>
> And it was so bad at one point you had to keep coming in and out that Sergeant Ray [sic] and I actually opened the windows in the house to try to get some air in there.

He said that the cages within the house were "three by three or four by four." He described two dogs in one of the cages:

> Immediately when I walked in the door, . . . there were two Doberman Pinscher puppies that were in a cage right when you walked in the door. And the two dogs, they appeared kind of sluggish and . . . they had no food or water in there, and as well as these dogs were basically living in their own feces and urine.
>
> So I took and I got a pitcher of water and I went back to the cage and I remember . . . pouring the water through the cage into the dogs' bowl. And I had to go back to this cage probably two or three times, because every time I filled the bowl up, both dogs immediately drank all the water up.

And, . . . after a short while of doing that they started to come back to life a little bit, because these were puppies . . . that were really playful. You know, you could see that it made a difference.

He described, in one of the other cages, a Doberman Pinscher with tape on its ears and that "there was so much feces and urine in this dog's cage that the dog had cowered up into – into the back of one corner of the cage, and he was just kind of standing there like this." He said that this dog "couldn't lay down or he refused to lay down in it, and he was just over there kind of whimpering in the back of the cage."

As to the outside kennels, Agent Frank said that he "could smell out there just as well." He said that the outside areas "were pretty much littered with feces, as well," but the smell "wasn't quite as bad because it was outside." The dogs "had no food, no water, and most of them appeared, . . ., a little bit sluggish." He said that the outside pens were "littered with feces" and "weren't clean at all."

Mark Wray[1] testified that he was a sergeant in the Criminal Investigation Division of the Madison County Sheriff's Department. He said that he had executed a search warrant at the defendants' premises on April 14, 2000.[2] Accompanying him were Investigator Gerald Wiltshire, Deputy Jason Favara, and Special Agent Tim Frank. As they entered the residence, there was "a strong ammonia-type odor to the point where it physically – you physically have trouble breathing at times, due to the stench associated with it." He said that inside one of the crates in the living room were small dogs, the crate floor "being feces covered; no apparent water available to the dogs." Another crate contained a Doberman with bandaged ears and its crate was "feces and urine infested, very unsanitary." Another dog, which he believed to be a Shar-pei, had a puppy in its crate, and the crate had a towel on the bottom and "was pretty much clean," but the crate had no water. Another crate also held a Shar-pei, this one with three or four puppies and the floor was clear, although no water was available. A crate in another room contained a Shar-pei, perhaps with a puppy, and "[f]eces covered the floor, feces and urine." In two nearby crates were a single Doberman in one and two Dobermans in another. These crates "had an enormous amount of feces and fluid in the bottom." He believed that fourteen dogs were housed inside the trailer. He described the odor inside the trailer as being "a combination of an excessive amount of feces and urine" that made it "seem[] as if you're walking into an ammonia factory." He said that he had "difficulty breathing for some two or three days after leaving the property." Officers opened the doors and windows of the trailer to ventilate it as they were inside.

As to the dogs kept in the outside kennels, Sergeant Wray testified that "a large number of the dogs did not appear to have any water available to them." He said that "even before you got to

---

[1]His name is spelled "Wray" in the search warrant affidavit and "Ray" throughout the transcript. Because the former spelling appears to be correct, we will utilize it in this opinion.

[2]Wray first said that the search warrant was executed on October 14, 2000, but later corrected himself to say that it occurred on April 14, 2000.

the wooded area, you could smell the feces and the urine that obviously had not been cleaned for a number of times or a number of days." He said that "[m]any of the dogs had very recognizable sores, injuries. Some dogs had trouble walking." During the testimony of Sergeant Wray, the jury was shown a videotape of the defendants' premises which he had made shortly after arriving there on April 14, 2000; and, he provided narration as the tape was shown. Describing a kennel which housed American Bulldogs, he said that on the ground "was feces infested to the point where in places you cannot tell there was pea gravel inside of the kennels." He described a kennel housing a Bull Terrier as having feces "two to five inches thick in places." He said that he saw "a large amount of ticks on most of the dogs." Sergeant Wray testified that, after seeing the conditions at the defendants' property, he contacted the JMCHS to ask for assistance in removing the dogs, having earlier put them on "standby."

Larry Brown testified that he was an investigator with the Madison County Sheriff's Department and had been involved in the execution of the search warrant on the defendants' property and in its return. He said that he had first visited their property on April 15 at approximately 12:30 p.m. and that Deputies David Ward and Allen Baxter were present when he arrived. His purpose for going to the location was to see if the deputies who were there needed "anything" to determine how much longer they would be at the premises, since he "would have to be there for the termination of the search warrant." Personnel from the humane society were loading dogs into portable crates to be taken from the property. He left and returned at approximately 2:45 p.m. and found the same two deputies still there, as well as the humane society personnel. He stayed at the location until approximately 5:45 p.m., when the execution of the search warrant had been completed and all dogs removed. He filled out the return portion of the search warrant and the return was made by another deputy.

On cross-examination, Investigator Brown said that the humane society employees he had seen at the premises during his first visit were Shanie Garcia and her husband, as well as Kimberly Lewis and another employee whom he did not know by name but had seen at the humane society, but only the former two were there when he returned later that afternoon. He said that he had not marked any of the dogs for identification purposes but had counted them as the day ended. The deputies had not made a count of the dogs, and he did not know whether any had been taken from the premises between his visits to the premises. He said that he had listed eighty-seven dogs on the return, which "was the number after getting the paperwork from the Humane Society personnel," as the dogs removed from the premises. He said that he did not know, of his own knowledge, that this was the number of dogs removed from the premises.

Shanie Garcia testified that she was employed as a transplant coordinator for Tennessee Donor Services and was on the advisory board of the Jackson-Madison County Humane Society. She said that she had been asked by Sergeant Mark Wray to assist on April 14 at the defendants' premises and had "[o]rganized the shelter staff, vehicles, a volunteer, a veterinarian to be able to come to the property to evaluate and, if necessary, remove animals." In this regard, she spoke with Jenny Krueger, the shelter manager, and Dr. Lisa White. Additionally, she contacted a volunteer "who had a horse trailer and a large pickup truck." She said that "[q]uite a few of the shelter

employees came" to the defendants' premises. Asked to identify the persons present there, she said that they were employees of the Madison County Sheriff's Department and the Jackson-Madison County Humane Society, as well as one person from the Dyersburg Humane Society and two from the Memphis Humane Society. She said that these people showed their identifications to the sheriff's deputies and to her as they entered the property.

Garcia described the conditions of the outside kennels:

> About as poor as I had ever seen. And that's not just what I've been able to see in person, which I've been on a lot of animal cruelty situations. But it was as bad as some things that I've seen on the internet or television or what not. It was really bad. It was very, very bad.
>
> Dogs were covered with fecal material. There was not fresh water available in that if there was any moisture in the bucket, the bucket was overgrown with I would say an algae-type material on the interior of the bucket or fecal material within the bucket.

She described the interior of the defendants' house, saying that "the ammonia smell from the urine was almost completely intolerable. My eyes were watering to the point where I had – had tears flowing. My nose was running because of the . . . horrible ammonia smell." Garcia said that there were "large amounts of fecal material" in the cages, "as well as in the immediate area outside of the cages." She said that none of the dogs within the house had access to water, except a Doberman which had access to a commode in the bathroom. She testified that the JMCHS kept records for each of the dogs removed from the premises, agreeing that these records were made in the ordinary course of business, partly for purposes of medical treatment. She said that it was the "standard practice" to prepare such records "on every animal within the facility or any animal that comes in the facility for any reason."

Jenny Krueger testified that she was the shelter manager at the Jackson-Madison County Humane Society. Much of her testimony was identifying photographs of various dogs. She said that the dogs were photographed at the humane society beginning on April 15 and it was possible some of the dogs had been dipped before being photographed.

Kimberly Lewis, an employee of the Jackson-Madison County Humane Society, testified that she went to the defendants' premises on April 14-15, 2000, to assist Ms. Krueger and other employees with the seizure and transportation of the dogs to the humane society. The first thing she noticed when she entered the defendants' home was "two young Dobermans in a cage and it had maybe three or four inches of feces inside the cage." She described the living conditions of the dogs as "[e]xtremely bad." In the hallway, she observed a mother Shar-pei with a puppy which "seemed to be dying." Four cages in a bedroom containing a Shar-pei and three Dobermans had "a lot of feces" and no food or water. Inside the house, there was "[a] really strong ammonia smell [and] a

-10-

feces smell." Lewis also observed the kennels in the woods which had "several inches of feces . . . just thick muck." The dogs in those kennels had to stand in the feces and muck because "[t]hey didn't have anywhere dry to get." The water buckets in the kennels were empty. Several puppies found in a shed beside the house were "loaded with ticks and fleas and feces."

Ms. Lewis said that a count of the dogs being transported was made on a tally sheet which she gave to Ms. Garcia. After the dogs were transported to the humane society, Lewis helped bathe them with a paramite dip to kill the fleas and ticks. Some of the seized dogs were subsequently turned over to Anne Wellans with the Bull Terrier Rescue.

Anne Wellans of the Bull Terrier Club of America testified that she received five female Bull Terriers from the Jackson-Madison County Humane Society on April 15, 2000. Wellans said that one dog "had ticks on her like I've never seen before . . . all down her chest and on her ears." That dog was "in very rundown condition, very thin." Another dog was "terribly underweight" to the extent that her ribs and hips bones were visible. All five dogs were "coated with feces" and "[s]melled terrible." Three dogs "had pads that were bleeding."

Dr. Tom Wright testified that he was a veterinarian residing in Glenwood, Arkansas, and had received two dogs from Anne Wellans, "a brindle Bull Terrier female and a white Bull Terrier female with brindle markings." He received the white Bull Terrier on May 14, 2000, and described its skin condition as "a large bare patch of thickened skin on her back that it was reported to me was a result of a tick infestation and was consistent with that." The patch was "red, thickened, approximately three by four inches on the side of the upper back right behind the shoulder blade." He said that this was consistent with "[a] dog having a great number of ticks." He described the behavior of the dog:

> [I]nitially when we received the dog she would not respond to any verbal commands, wouldn't respond to here or come, no, and it was actually reported to me that she was deaf.
>
> We discovered she was not deaf but evidently just had never been taught to respond to anything. She's learned to come on command and that sort of thing.
>
> She is somewhat shy of strangers, hesitant to go into wide open spaces like a large yard. We have some smaller runs about ten by fifteen, ten to twenty that she's more comfortable in. She seems to be very nervous in large areas.

Dr. Wright described other behavior of this dog he considered unusual:

I guess the most striking thing is when she does urinate or defecate on a surface that does not immediately absorb the urine, she turns and tries to clean it up. She will drink her own urine on occasion.

He said that the dog had done this five to ten times on the back deck and several other times in the pen, and that this behavior was a sign of water deprivation.

On cross-examination, Dr. Wright said that the dog had been underweight when he received her. The other female Bull Terrier he received also drank her urine on occasion and was underweight, as well.

Dr. Lisa White testified that she was a Doctor of Veterinary Medicine and operated Parkway Animal Hospital in Jackson. She said that she was one of several veterinarians in the area who provided certain services for the JMCHS. She had been contacted by Shanie Garcia on "a Friday afternoon in April" and asked to come to the defendants' property. Dr. White described what she observed inside the defendants' house:

> A   [W]hen you walked in the front door a strong, strong ammonia and stool smell, poop smell, enough that it would make your lungs kind of hurt almost as if you have breathed paint fumes, make your eyes start to sting.
>
> Q   Did you think –
>
> A   A very pretty living room.  But next to the pretty chairs were crates with animals in them, and sometimes several dogs to a crate, and about two inches – about ankle deep in feces and urine.
>
> Q   Okay.  How would you describe the living conditions of these dogs as far as cleanliness?
>
> A   There wasn't any cleanliness.  They had mashed the poop to just muddy – like, again, a two-inch mess across the bottoms of the crates. They had it on their bodies.

As to the floors of the crates inside the house, she said that "[t]he poop and the pee had been mashed to this muddy consistency across two inches of the crate."

Dr. White then went to the outside kennels and described what she saw:

> A   Well, again, the backyard was well mowed and maintained.  And you walked toward the woods and then suddenly you heard these dogs, you heard many dogs barking and were hit with a smell.  It was

almost like being hit with a wall of ammonia smell, a strong urine smell.

The dogs were in chain-link kennels. I don't know the size; like, you know, that eight-by-eight or ten-by-ten chain-link kennels. There were usually several dogs to a kennel.

They had pea gravel floors, but, again, there . . . was quite a lot of stool, fecal matter, and you could tell from the ammonia, quite a lot of urine.

Q   Now, in regard to the cleanliness of these living conditions of the dogs in these outside kennels, was it good or bad?

A   Pretty bad.

She went inside the puppy shed and described it by saying, "If there was ventilation, it wasn't adequate to get the ammonia smell out." Dr. White described, generally, the records of the JMCHS as to each of the dogs taken from the defendants' premises, saying "[t]his is an examination checklist. It's a standard Humane Society form that every dog, not just the Webbs' dog, but every dog that comes into the Humane Society gets this checklist exam. And then it has a second page that goes into more specifics over the checklist." We now will set out testimony which is specific as to certain of the dogs.

### Count 1 - Shar-pei

As to this dog, Dr. White testified that, according to the examination checklist, coat and skin parasites were checked, as were eye and ear discharge and hair loss on legs and paws. She read specifics as to the dog's condition:

The other notes are that the reason that the eyes have weeping is that the left eye has infection, so kind of a pussy weepiness. Some hair loss and infected left ear. The right ear is dirty and needs cleaning. A lot of fleas and ticks and a small wound on the top of the head appears to be a bite wound.

### Count 2 - Shar-pei

As to this dog, Dr. White said that it had "skin parasites, fleas, and ticks," and his "eyes had a discharge." Tests showed that the dog had heartworms and roundworms. Further, he had "[s]mall wounds on the muzzle, sores on the sides of each rear leg." Photographs of this dog show a wound on its muzzle, near the nose, and wounds to its hind legs.

### Count 6 - Shar-pei

Dr. White said that this dog was "very pregnant [and] had some missing teeth and gum disease . . . [f]leas and ticks."

### Count 7 - Doberman Pinscher

Dr. White described the problems as to this dog:

> Number seven is a Doberman. She had a type of intestinal parasite called coccidia. And she had recently had her . . . ears operated on to make them stand up, and there was quite a lot of . . . fecal matter that was stuck on the bandages. The bandages were brown that were on her ears on the surgery site.

Dr. White said that everyone "remember[ed] this dog. She was . . . two inches deep in stool and urine that had been kind of pulverized into this mush." She said that the dog had been kept in a crate, "about two by three or so."

### Count 9 - Shar-pei

Dr. White said that this dog also was a puppy, with "roundworms, round intestinal worms, infested with fleas and ticks, had a pussy discharge from both eyes, ticks between the toes."

### Count 10 - Shar-pei

According to Dr. White, this puppy "had roundworms in her stool and also possibly another kind of intestinal parasite called giardia . . . [i]t's more like a single-cell sort of Montezuma's revenge for puppies." Also, she "had a lot of ticks, ticks stuck between her toes, ticks on her ears, discharge from both eyes."

### Count 11 - Shar-pei

This dog, also a puppy, had roundworms, as well as "ticks on his back, underside, its ears, between its toes," and its left front foot was "swollen and infected." A photograph of this dog shows its swollen foot.

### Count 12 - Doberman

This dog had both roundworms and coccidia, and "[t]he bottoms of its feet were red and irritated with some mild bleeding on its feet. And it was very underweight." A photograph of this dog shows that it was very thin. Another photograph taken before the dogs which are the subjects

of Counts 12 and 13 were removed from their cages at the defendants' premises shows that they were kept in the same cage, which had no food or water and feces had accumulated on the floor.

### Count 13 - Doberman Pinscher

This dog was found in a crate with the dog which was the subject of Count 12 and had roundworms and coccidia, as well as ticks and a coat which was dirty with fecal matter. The bottoms of its feet "were irritated and bleeding." In the photograph of this dog, its feet appear to be swollen.

### Count 14 - Basenji

According to Dr. White, this dog "had a lot of ticks, thin hair coat, some hair loss, sores on both front legs, and it was limping from those sores. The bottom of the paws [were] red and irritated."

### Count 15 - Basenji

This dog had ticks between its toes and a sore over its right eye, as well as sore feet. A photograph of this dog shows the sore above its right eye.

### Count 18 - Shar-pei

This dog, according to Dr. White, was "infected with ticks, hair loss, irritated skin, an infected cut on its left ear, missing teeth." Additionally, the dog had "scabs on its back," a "staph infection on her skin," and a "cherry eye in the right eye where the eye gets irritated enough that . . . a third eyelide . . . sweeps across this way." Jenny Krueger identified a photograph of this dog, saying that it showed ticks on the dog and a puncture wound on its ear. Additional photographs of this dog show irritated skin and scabs on its back.

### Count 19 - Doberman Pinscher

This dog had been caged in the house, and a photograph of it shows hair loss on the hindquarters, tail, and legs.

### Count 20 - Shar-pei

Dr. White said that this dog was "infested with ticks and fleas, discharge from both eyes, hair loss, infected ears." Photographs of this dog show the discharges from its eyes and numerous ticks, including between its toes.

### Count 21 - Shar-pei

Dr. White said that this dog was a puppy with "a lot of ticks including ticks between its toes. It had roundworms and coccidia in the stool sample. Both eyes had discharge." Jenny Krueger identified a photograph of this dog, saying that it showed ticks attached "between the toes on the paw," as well as a tick above the eye and "a lot of ticks on the underneath part of her body." The jury fixed a fine of $1000 for each defendant as to this dog.

### Count 22 - Doberman Pinscher

Dr. White testified that this dog "had some hair loss, especially on its head and around its ears" and "[t]he bottoms of its feet were irritated and had fecal matter." Photographs show its hair loss.

### Count 23 - Shar-pei

According to Dr. White, this dog was a puppy, which was "infested with both ticks and fleas, had hair loss on its tail." Jenny Krueger identified a photograph of this dog, saying it showed ticks on the dogs underside "as well as red spots from tick bites." Photographs of this dog show numerous ticks and red spots on its underside.

### Count 24 - Shar-pei

Dr. White said that this dog was "about a twelve-week-old puppy" and was "infested with ticks, ears were full of ticks. Its right eye was infected and it had both roundworms and coccidia on its stool." Photographs of this dog show a large number of ticks on its underside.

### Count 25 - Shar-pei

This dog, according to Dr. White, had "roundworms and coccidia . . . a lot of ticks, infection in its right eye, especially an abscess under its right eye." She said that its "ears were dirty and full of ticks." Jenny Krueger identified a photograph of this dog, saying that it showed "[t]he underneath part of the body has a lot of ticks, some that are swollen," as well as ticks under a front leg.

### Count 26 - Shar-pei

Dr. White said that the record for this count showed that it was a "mama and pups," and that the mother was "infected with ticks and fleas, and hair loss on the rear legs." The puppies had roundworms and ticks and runny or infected eyes. During the trial, the State elected to proceed on this count only as to the mother, and this election is reflected on the verdict form.

### Count 28 - Bull Terrier

Dr. White said that this dog was "probably the worst . . . out there." This dog had only "a few hairs." Describing the dog's problems, Dr. White said:

> Her face was very irritated, swollen. Her legs and feet were swollen and infected. Her toenails were long and curled. The nailbeds were bleeding and the toenails were loose. In fact, they'd just fall out.
>
> The eyes – Both eyes were infected. She couldn't walk. Her heartworm test was negative. Her – We did a skin scraping on her and she had a type of mange called demodectic mange, demodex mange.

A photograph taken of this dog before it was removed from its outdoor cage at the defendants' premises shows that it had substantial hair loss throughout its body and red and swollen paws. The ground in the caged area appeared to have a substantial amount of feces. The jury fixed a fine of $1000 for each defendant as to this dog.

### Count 31 - Mastiff

Dr. White said that this dog "was covered in mud and feces, infested with fleas and ticks. There was a cut between the toes on the front foot and the bottom of the feet were bleeding."

### Count 32 - Mastiff

Dr. White said that this dog was "[c]overed in feces and mud, ticks and fleas. Hair loss on the back, the bottom of the feet are bleeding. And, again, there's like a tear between the toes like cracking from infection."

### Count 33 - Bull Terrier

Dr. White said that this dog had "a lot of hair loss and sores on the skin," with the stool sample showing coccidia parasites. Additionally, the dog was "[i]nfected with fleas and ticks. Hair loss and scabs on the tail, underweight. Sores on the hind legs." Photographs of this dog show sores throughout its body.

### Count 34 - Bull Terrier

Dr. White said that this dog was "[i]nfested with the fleas and ticks, sores on the feet and legs." Additionally, the dog had "[m]ultiple sores on the legs and paws."

### Count 35 - Shar-pei

This dog, according to Dr. White, had "the intestinal parasite coccidia" as well as "fleas and ticks and a thin hair coat."

### Count 36 - Shar-pei

Dr. White said that, according to the records, this dog's "feet and tail were covered in fecal matter, hair loss on the back and the face, sores on her feet, infected with ticks." Additionally, she had tapeworms.

### Count 37 - Shar-pei

Both of this dog's eyes were infected, and it had "patches of hair loss on the body, pressure sores on the top of the feet and on one leg." Additionally, the dog was "[i]nfested with fleas and ticks" and had tapeworms. A photograph of this dog shows substantial hair loss around its tail.

### Count 38 - Shar-pei

Dr. White said that this dog "had hair loss throughout the body, infested with ticks and fleas, and sores on the feet and tapeworms in the stool."

### Count 39 - Shar-pei

Dr. White said that, according to the records, this dog had "[h]air loss throughout the body, discharge and infection in both eyes, infested with fleas and ticks, sores on the feet."

### Count 40 - Shar-pei

Dr. White said that this dog had "sores on the feet with fecal material between the toes. H[is] front paws were swollen from infection. Hair loss, fleas and ticks, very long toenails." Additionally, the dog had a testicle which "was very large, which is an abnormality which can indicate either infection or possibly even a tumor." A photograph of this dog shows it standing with its right front paw, which appears to be swollen, raised off the ground. The jury fixed a fine of $1000 for each defendant as to this dog.

### Count 41 - Shar-pei

This dog had "hair loss, both eyes infected, left ear infected with – That infection was a possible wound on that left ear. Infested with fleas and ticks."

### Count 42 - Bull Terrier

Dr. White said that this dog had "[h]air loss on the tail, the ears, the face, infested with ticks, sores on the hip and on the feet, a wound on the end of the tail, healing scars and scratches on the face." A photograph of this dog shows hair loss on its tail and sores on its hindquarters.

### Count 43 - Bull Terrier

Dr. White said that this dog "had hair loss and sores on her feet and legs, a lot of fleas and ticks." Photographs show this dog's front paws to be swollen, with sores and much hair loss.

### Count 44 - Shar-pei

Dr. White described this dog's condition as "[t]ick infested, with hair loss under the chin, on the chest, and on the rear legs. Fecal matter is matted to the fur. Discharge in both eyes."

### Count 45 - Shar-pei

This dog was "[i]nfested with fleas and ticks, a lot of dirt and fecal matter on the feet and legs and tail, discharge from both eyes, limping on the back legs with a sore on the foot."

### Count 46 - Shar-pei

Dr. White said that this dog "was infested with ticks, [and] had mild hair loss."

### Count 47 - Shar-pei

Dr. White said that this dog had "[h]air loss all over, infested with ticks and fleas, red, irritated skin, hair loss down the hind quarters, long toenails and sores on the feet, dirt and fecal matter in the fur," with stool samples showing that the dog had tapeworms.

### Count 48 - Shar-pei

Dr. White said that this dog had "[h]air loss on his legs and his feet, fleas and ticks, a bare tail, pressure sores on his hocks – that's his back legs – and his elbows." Additionally, the dog had "[t]apeworms in the stool" and infected feet. Photographs of this dog show substantial hair loss on its tail and legs.

### Count 49 - Shar-pei

According to Dr. White, this dog was "infested with ticks and fleas. She had a better coat than most."

### Count 57 - Shar-pei

Dr. White described this dog's condition as "[h]air loss throughout the body, red, irritated skin, thin hair around the face, a wound on the top of the head, limping on the right front leg with a cut on the bottom of the foot, infested with fleas and ticks." She said that tests were positive for heartworms and roundworms. A photograph shows a cut on the bottom of this dog's right paw.

-19-

### Count 59 - Shar-pei

Dr. White said that this dog was "[i]nfested with ticks, fleas, hair loss throughout the body with reddened skin. Most of this irritated skin was at the base of the tail and down the rear legs. Redness on the feet." A stool sample from the dog showed that it had tapeworms. Photographs of this dog show substantial hair loss and irritated skin.

### Count 64 - Shar-pei

This dog, according to Dr. White, had "[h]air loss down the back and rear legs, sores between the toes, infection between the two middle toes on the front left foot, infested with fleas and ticks. Sores on the hock. That's the pointy back end of the back legs. A small wound on the scrotum."

### Count 67 - Shar-pei

Dr. White said that this dog had "[h]air loss on the left side, small pressure sores on the legs, a bite wound on the right side and hip. They palpated a small mass underneath that was possibly a mammary tumor or a little breast tumor." Additionally, the dog had roundworms. Photographs of this dog show hair loss.

### Count 75 - Shar-pei

Dr. White said that this dog had "[i]nfection in both eyes, infested with fleas and ticks, sores on the elbows and the hocks on the hind quarters. The feet are swollen and infected and the dog is limping." Photographs of this dog show large sores on its legs and hindquarters.

### Count 91 - Bull Terrier

Describing the condition of this female dog, Anne Wellans testified:

> A   I would say she was the worst of the group. She had ticks on her like I've never seen before. I'm told that they're called a nest of ticks. But that big around on each side of her shoulder, all down her chest and on her ears.
>
> Q   It's fair [to] say that she was heavily infested with the ticks?
>
> A   Heavily infested, heavily infested. And in very rundown condition, very thin.

The jury fixed a fine of $1000 for each defendant as to this dog.

**Count 101 - Shar-pei**

Dr. White said that this dog had sutures and discharge in both eyes as a result of its eyes having been "tacked." The dog also was infested with ticks and had roundworms and coccidia. Photographs of this dog show discharge from its eyes and ticks on its paws and underside. The jury fixed a fine of $1000 for each defendant as to this dog.

**Defense Proof**

Sandra Kay Webb testified that her employment hours on April 14, 2000, were 8:30 a.m. to 4:30 p.m. and, in addition, she had owned Shaolin Kennels for about seven years, dealing with Shar-Pei, American Bulldogs, Basenjis, Bull Terriers, Mastiffs, and Doberman Pinschers. It had become a licensed kennel three years earlier, the licensing process requiring that the kennel be inspected, which was done by Dr. Danny Walker who also vaccinated the dogs. Additionally, she was a member of Responsible Animal Owners of Tennessee. She said that she had returned home on April 14 at about 4:30 p.m. and left again to look for an injured animal, locking the gate as she left. As she returned, she found that the gate was open and she saw a car from the sheriff's department, as well as other vehicles. She went to her parents' house and called her attorney. She said that normally the crates inside the house were cleaned after she arrived home from work. However, the crates had not been cleaned out on April 13 because her daughter had not been feeling well. She said that they had not kept food and water in the crates which contained puppies because it endangered them. The Dobermans did not have food and water in their crates because it was given to them outside. She said that the puppy shed was cleaned each morning and became dirty again during the day. The doors to the puppy shed were kept closed because of danger from predators and the difficulty puppies had in climbing back into the shed. She said that food and water was kept in the puppy pens at all times, but the containers sometimes were knocked over. Feces in the outside pens was picked up about twice a week. They also put down lime to control the odor and gravel, which last had been spread three to four days prior to the execution of the search warrant. Each morning they made certain the dogs had water in the kennels and gave fresh water and food to the dogs each evening. She said that, during the spring, water in the buckets could turn green overnight because of fungus. Webb said that she was the founder of the Jackson Kennel Club.

On cross-examination, Sandra Webb agreed that Dr. Walker had last come to their premises in June 1999, and had not seen the kennels as they existed on April 14, 2000. She said that the doors were shut on the shed where the puppies were kept and that they could not get out. There was light coming into the shed from two windows and there was no water because it was not feeding time. Shown a photograph of one of the crates within their house and her opinion of its degree of cleanliness, she said that it was "reasonable under the circumstances." She said that the kennels had last been cleaned "three to four" days before the execution of the search warrant. Pea gravel had last been put into the kennel "[a]pproximately a month before." Asked if the dogs shown in a photograph of the kennel were "standing there in their own feces and urine," she responded, "They are standing it looks like in partially mud from the rain."

On redirect examination, Webb testified that in 1998, some of the kennel expenses were $6421 for food; $4762 for "kenneling"; $506 for sanitation; $4,687 for veterinarian fees; $722 for registration; $335 for pedigree fees; and $350 for gravel.

Denise Edwards testified that she had known the defendants all of her life. She raised dogs and used to work for a veterinarian. She had assisted the defendants the first time puppies were born at their kennels. She had not seen any indication that the defendants were mistreating their dogs, but she had not been to the location where they had been living when the search warrant was executed. After the defendants' dogs had been seized, she had gone to the humane society to look at the dogs taken from them. She saw a "lot of Shar-peis" and "[t]he ones in the . . . very back kennels were in good shape." While at the humane society, she saw a Shar-pei, in urine and feces in the bathroom, that appeared to have red mange. She said that employees of the humane society did not know that she was there inspecting the dogs.

Dr. James Kuhlman testified that he was a veterinarian and operated the Humboldt Animal Clinic. He said that he had treated animals, mostly Shar-peis, brought to him by the defendants since 1992 and, on occasion, had sold medical supplies to them. Dr. Kuhlman "[m]ostly [] filled out health certificates for them to ship dogs," recounting that he had prepared ten such certificates in 1999. He said that he had not performed eye surgery on any of the defendants' Shar-peis, but "[m]aybe a time or two" had treated some of them for skin conditions. He agreed that "all that extra skin" of Shar-peis could result in hair loss and hot spots. He said that "[m]ost dogs have worms, unless you're worming them all the time," and that a dog with fleas also would have tapeworms, which are the "intermediate host." Additionally, Dr. Kuhlman said that in the South, heartworm, spread by mosquitoes, was "[v]ery prevalent" unless preventative treatment was given. He said that there was a monthly flea and tick treatment, but "if you've got a lot of dogs[,] it's probably prohibitive financially to do that." Dipping the dogs would be a reasonable alternative. He said that mange was found in dogs with "poor immune system[s]." He said that he had performed a procedure on some of the defendants' Doberman Pinschers to make their ears stand up straight, and told the defendants "to leave [the bandages] on until they look so bad you want to take them down." He said that dogs in kennels without proper bedding can get "pressure sores."

Dr. Kuhlman said that he had viewed the videotape made during the execution of the search warrant at the premises of the defendants and that the dogs "looked all right" to him. As for dogs being kept in cages, he said that he had five dogs of his own which "come in every night and get in their cage and stay there all night." He said that caging a dog was a method of housebreaking it.

He testified that he had visited the puppy shed at the defendants' property and that it "had a heater and an air conditioner so the temperature should have been all right." He said that "[d]epending on how often it got cleaned, it was very adequate." As for leaving a water bowl with puppies, he said that it was not a good idea and he had had "them drown in [his] own." He said that he had visited the kennels located under the pine trees on the defendants' property and they were properly shaded. He said that show dogs were kept on pea gravel, new layers of which should be put down periodically. He said that the amount of feces in the outside kennels was "all right," and

that, with kennels, "you can't clean them every day probably." It appeared to be "time to clean" some of the kennels. Asked if any of the dogs shown on the videotape needed medical treatment, Dr. Kuhlman said that "quite a few of them had some skin problems; probably needed dipping." Most of these dogs were Shar-peis, which are "white dogs, light-colored dogs." He said that the dogs "all looked fairly well nourished," and that the bags of dog food shown on the tape were "some of the better foods." Dr. Kuhlman had sold both a deep-cleansing shampoo and mitaban to the defendants. He had visited the defendants' kennel the weekend before trial, and agreed that it looked reasonable.

Tabitha Nicole Webb testified that she worked for her mother in exchange for being supported by her and that she owned very few dogs herself. She said that she had taken a number of animal science classes through Harcourt Learning Direct in Scranton, Pennsylvania, and had earned a diploma. Additionally, she said that she had learned a good deal from Drs. Walker and Kuhlman, assisting the latter in surgery on some of their dogs. She said that she had "flare-ups with a heart problem" and on April 13, the day before the search warrant had been executed, as she was driving, she felt a tightening in her chest and tingling in her left arm, and she "blacked out," ending up in a ditch. As a result, she varied in her normal routine for the kennels. She said that she was in charge of the daily care of the animals, including dipping and buying supplies. It had been "close to three weeks" prior to April 14 when the dogs last had been dipped. She said they had a tick problem because the kennels were in a wooded area. To get rid of the ticks, they used dursiban granules in areas where the older dogs were kept, but used a paramite dip with the puppies. When the search warrant was executed, it was time to dip the dogs again but she had not done so because of rainy weather. She said that ticks "can come on pretty quick."

During her direct examination, Tabitha Nicole Webb identified by name a number of the dogs from photographs which had been taken in 1999. She said that she was familiar with all of the dogs which had been at the Shaolin Kennels on April 14, 2000, when the search warrant was executed. Webb testified that she had obtained copies of and reviewed records of the Jackson-Madison County Humane Society as to dogs taken from the premises as the result of the execution of the search warrant.

Webb said she provided "medical care" for their dogs and that they were not dipped as often in the winter "[b]ecause when you dip them it opens up the pores of the skin and it being cold outside, I do not want to give my dogs pneumonia." Also, she said that "there's not as much of a need such as fleas, ticks in the wintertime." In the spring, their dogs were dipped "about once every two to three weeks." It would take three or four days to dip all of their dogs. The dogs had not been dipped "close to three weeks" prior to April 14, 2000. She often removed ticks by hand prior to dipping, and said if she had not done so, "[the dogs] would have been covered in ticks." They had a problem with fleas and ticks in the outside kennels, even though they used "durisban," an insecticide used to kill ticks and other pests.

On cross-examination, she said that four photographs which had come into evidence during the testimony of Sergeant Mark Wray did not show the conditions of the crates inside the house "the

last time [she] saw the crates." She said that her "normal practice was to keep the dogs as reasonably clean as possible." She valued the dogs they had on April 14, 2000, at $132,000.

## ANALYSIS

### I. Search Warrant

The defendants present several claims on appeal as to the search utilized by officers to enter their property. They argue that the affidavit to the warrant fails to establish probable cause; the affiant made false claims in the affidavit; and the warrant was executed by persons other than the officer to whom it was directed. Thus, by their analysis, the fruits of the warrant should have been suppressed.

Before reviewing these arguments, we note first that the claims set out in the motion to suppress were that the search warrant affidavit failed to establish probable cause because (1) it was based solely upon hearsay, with no showing of reliability or independent corroboration; (2) it did not establish that the information was not stale; (3) it did not establish that the property to be seized would be found at the premises; (4) it did not establish that the defendants lived at the location to be searched; and, further, the property to be searched was not adequately described and the warrant was not executed by the person to whom it was issued. At the hearing on the motion to suppress the search warrant, the defendants argued only that the affidavit did not establish probable cause, but the trial court concluded that probable cause was established. Thus, on appeal, the defendants have presented additional theories for suppression that were not argued at the suppression hearing or in their motion for new trial, as we will discuss in our review of this issue.

### A. Sufficiency of the Affidavit

The affidavit to the search warrant provided as follows:

> Personally appeared before me, SGT. MARK S. WRAY, who makes oath that he has probable cause for believing and does believe that SANDRA WEBB is/are in possession of the following described property, to-wit: Dogs, any and all correspondence or records which tend to show documentation related to business practices of breeding, selling, shipping, or caring for dogs. The previously described property would show fraudulent business practices and cruelty to animals[] contrary to the laws of the State of Tennessee, upon the following described premises to-wit: 179 Sanderson Road, Mercer, Tennessee. From the intersection of U.S. 70 West and State Route 138 in Madison County, Tennessee travel south on 138 approximately 11.2 miles, turn left (eastward) onto Sanderson Road and travel approximately 1 mile at which time you will come to a driveway which is on the south side of Sanderson Road and has a red colored

cattle type gate with no trespassing sign affixed to the gate. The dwelling appears to be a double wide mobile home beige in color with dark green shu[tt]ers. The front door of dwelling appears to face eastward. [A]nd his reason for such belief and the probable cause for such belief are that Affiant has investigated at least four cases since February 06, 2000 in which Sandra and/or Nicole Webb have sold puppies that have been sick and in need of veterinary care or have received payment for the shipment of a puppy and have not produced the puppy in question. Investigator Gerald Wiltshire with the Jackson Police Department has seen on the property what appeared to be kennels normally used to house dogs. Sandra Webb is shown through county records to reside at 179 Sanderson Road in Mercer, Tennessee. The phone number of 901-424-6199 which has been used in communication with your affiant's complainants is listed to Sandra Webb at 179 Sanderson Road in Mercer, Tennessee. Your affiant's complainants have provided information which shows that money orders, cash and personal checks have been mailed to and transacted by Sandra and/or Nicole Webb. Information is that Shaolin Kennels and Sancole Kennels are two of known names used in the course of conducting business. Information has been provided to your affiant that Sandra and/or Nicole Webb are breeding, selling, raising, shipping and caring for dogs.

Affiant therefore asks that a warrant issue to search the person of SANDRA WEBB and the premises herein described, either by day or by night, where he believes said Dogs, any and all correspondence or records which tend to show documentation related to business practices of breeding, selling, shipping, or caring for dogs. The previously described property would show fraudulent business practices and cruelty to animals[] is/are now possessed, contrary to the Laws of the State of Tennessee.

The defendants explain this argument in detail in their reply brief, saying that Sergeant Wray had no basis to believe that the four persons providing information about the defendants were reliable:

In fact, his testimony at the suppression hearing reveals that, in February and March 2000, three persons called him by telephone and reported that they had paid for a dog from Shaolin Kennels but had not received the dog. Two of these complainants lived in Kentucky and one lived in Alaska. Sergeant Ray [sic] obviously did not know these people personally, and he made no attempt to ascertain if they were telling the truth. The fourth complainant – a woman from

Arlington, Tennessee – called Ray [sic] and reported that she had purchased a puppy from the Webbs but that a subsequent veterinary inspection had revealed the puppy to be sick and malnourished. Again, Ray [sic] made no attempt to ascertain whether she was telling the truth.

In State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999), this court explained the showing which must be made when the information for a search warrant comes from a "citizen informant":

> In order for the informant to be considered a citizen informant, the affidavit should contain more than conclusionary allegations that the informant was a "concerned citizen source," "acted on civic duty," and "asked for no payment for their information." State v. Stevens, 989 S.W.2d 290, 294 (Tenn. 1999). Generally, a more particularized showing of the law-abiding nature of the person supplying the information is needed. Id. at 295. The reliability of the informant, as well as the information furnished, must be judged from all the circumstances and from the entirety of the affidavit. [State v.] Cauley, 863 S.W.2d [411,] 417 [(Tenn. 1993)]. A finding of probable cause by the issuing magistrate is entitled to great deference. [State v.] Melson, 638 S.W.2d [342,] 357 [(Tenn. 1982)].

The responsibility of a law enforcement officer, in assessing whether probable cause is created by a complaint from a person claiming to be a crime victim, as were the persons who had told Sergeant Wray that they had paid for dogs which the defendants had not delivered, was explained in Spiegel v. Cortese, 966 F. Supp. 684, 691 (N.D. Ill. 1997):

> A police officer is by no means expected to conduct a trial-type inquiry before making this determination; in fact, a statement by the victim of the crime will usually suffice. Gramenos v. Jewel Cos., 797 F.2d 432, 439 (7th Cir. 1986). However, if something about the victim or his report would lead a reasonable officer to question the victim's reliability, then the officer must proceed with a more thorough investigation before making an arrest. Hebron v. Touhy, 18 F.3d 421, 422-23 (7th Cir. 1994).

This issue arose in Neiman v. Keane, 232 F.3d 577, 581 (7th Cir. 2000), in which an arrestee had brought a civil rights action against the arresting officer, claiming that probable cause had not existed for the charges of obtaining services by fraud, contractors complaining that they had performed services at Neiman's house and he then had fabricated reasons not to pay for their services. The court distinguished the complaints from those determined in Hebron, 18 F.3d at 423, to require additional investigation (complaints from two evicted tenants as to violations by their

-26-

landlord who was evicting them) and determined that the complaints from contractors had created probable cause for the arrest of Neiman:

> That is not the situation in this case. Here the detective received five independent reports from contractors alleging that Mr. Neiman had not paid for services. Detective Keane had reason to believe that the complaints from the putative victims were truthful because all five businesses complained of the same behavior by Mr. Neiman. Thus, Detective Keane did not have an additional duty to inspect Mr. Neiman's premises to see if the work had actually been performed to Mr. Neiman's specifications.

Id.

The situation presented by the case presently under appeal is similar to that of Neiman in that here three persons, two from Kentucky and one from Alaska, had made identical complaints against the defendants to Sergeant Wray, that they had paid for dogs but not received them. That the defendants were in the business of selling dogs was verified by the fact that the fourth complaint to Sergeant Wray was that the defendants had sold a dog that was sick and in need of care. According to the affidavit, Investigator Gerald Wiltshire of the Jackson Police Department had seen, on the defendants' property, "what appeared to be kennels normally used to house dogs."

Thus, while the defendants are correct in asserting that a complaint from a person claiming to be the victim of a crime may require investigation or verification by an officer to determine whether probable cause exists, we conclude that because of the nature of the complaints to Sergeant Wray, probable cause resulted without the necessity of additional investigation.

### B. False Claims in the Affidavit

The defendants explain in their brief the basis for this claim, which is directed to the statement in the affidavit that Sergeant Wray had "investigated at least four cases since February 06, 2000 in which Sandra and/or Nicole Webb have sold puppies that have been sick and in need of veterinary care or have received payment for the shipment of a puppy and have not produced the puppy in question":

> Here, Sergeant Ray [sic] alleged that he had investigated four cases in which the Webbs had sold puppies that were sick and in need of veterinary care. In fact, he had received only one complaint of a sick puppy. While there is no direct evidence that Ray [sic] intended to deceive the magistrate, it is easily inferable that such is the case. There is simply no other reason that Ray [sic] would have made the statement.

Even if Ray [sic] did not intend to deceive the magistrate, the evidence must be suppressed because the statement was essential to probable cause and it was, at the very least, recklessly made.

As to this issue, the State argues that it has been waived because it was not raised until appeal. The defendants agree that the argument was not presented in the trial court but assert that it constitutes plain error, and, thus, may be raised for the first time on appeal. We will consider these arguments.

In State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994), this court set out the considerations for determining whether a matter not objected to at trial may be raised on appeal:

a) the record must clearly establish what occurred in the trial court;

b) a clear and unequivocal rule of law must have been breached;

c) a substantial right of the accused must have been adversely affected;

d) the accused did not waive the issue for tactical reasons; and

e) consideration of the error is "necessary to do substantial justice."

Id. (footnotes omitted).

During the hearing on the defendants' motion to suppress the search warrant, Sergeant Wray testified as to the four cases referred to in the warrant affidavit, saying he had investigated one case of a sick puppy being sold and three cases of the defendants' receiving payment for puppies which they had not delivered. He was asked about the wording of his affidavit:

Q   You had officers – And you had investigated four cases?

A   Right.

Q   But only one person had actually received a dog?

A   That's correct.

Q   And that was not . . . That information was not listed in your affidavit; is that correct?

A   I believe it said that . . . the dogs or the location – Wait just one second.

Q  Your affidavit – Let me read this to you.  In your affidavit: "Investigated at least four cases since February 26th, which they had sold puppies that have been sick and in need of veterinarian care or have received payment for the puppies and would not produce the puppy in question."

A  It said have sold puppies that have been sick and in need of veterinarian care or have received payment.  So it would be either/or.  It would not be multiple times of receiving puppies that are sick and multiple times of not receiving the dog.

Q  But you say puppies in your affidavit.

A  Right.  They . . . had sold puppies that have been sick or have received payment for the shipment of a puppy and have not produced it.

Q  But, in fact, there was only one puppy involved; isn't that correct?

A  There was only one –

Q  One puppy that was sick?

A  There was only one actual dog that was transferred, yes.

Q  That was sick?

A  Yes.

It does not appear that Sergeant Wray was asked any additional questions as to why his affidavit was worded as it was, and no other witnesses testified as to its drafting.  At the conclusion of the hearing, defense counsel argued that the affidavit was misleading as to claims investigated against the defendants:

> Well, the puppies in this case, . . . First of all, he could have been more specific.  There was one puppy that was in need of veterinary care.  And even if there had been, he did not tell the magistrate that that dog had a health certificate and he did not know where that animal came from.

At the conclusion of the hearing during which Sergeant Wray and Investigator Gerald Wiltshire of the Jackson Police Department and Investigator Larry Brown of the Madison County Sheriff's Department testified, the trial court denied the motion to suppress, one of its findings being

that "all the witnesses [were] credible." Regarding the wording of the affidavit, the court stated, "[T]his could have been drafted better. But I'm going to find that it does meet the adequate test, deny the Motion to Suppress."

The record simply does not support the defendants' argument that Sergeant Wray intentionally or recklessly misled the judge to obtain the search warrant. While the sentence in question is not a model of clarity, we understand it to state that, in the two months preceding the application for the search warrant, Sergeant Wray had investigated a total of four claims against the defendants, in which they either had kept payment without delivering the puppy or had delivered a sick puppy which needed veterinary care. We respectfully disagree with the defendants' claim that we must "infer" that Sergeant Wray intended to deceive because "[t]here is simply no other reason that Ray [sic] would have made the statement." In fact, the trial court found that the witnesses, including Sergeant Wray, were credible. There is no basis for our assuming otherwise. Accordingly, we conclude that this matter does not constitute plain error and, thus, is waived for purposes of appeal.

## C. Improper Execution of the Search Warrant

As to this assignment, the defendants argue on appeal:

> As the record clearly reveals, Sergeant Ray [sic] – the officer to which the warrant was directed – was not present during the great majority of the time in which the evidence was being seized in this case. In fact, the seizure of the evidence and, hence, the execution of the warrant, continued for almost eighteen hours after his departure. In light of [State v. Leon] Hurd, [No. E1999-01341-CCA-R3-CD, 2001 WL 348871 (Tenn. Crim. App. Apr. 10, 2001),] and the clear language of Rule 41(d) itself, this obviously is not sufficient to satisfy the rule. Thus, the evidence collected pursuant to the warrant must be suppressed.

As with the previous issue, this claim was not raised in the trial court, but is presented for the first time on appeal.

In their brief, the defendants argue that the search should have been suppressed both because "Sergeant Ray [sic] – the officer to which the warrant was directed – was not present during the great majority of the time in which the evidence was being seized," and that he "and the Madison County Sheriff's Department effectively abandoned the execution of the warrant by completely relinquishing control of the seizing and cataloguing of the evidence to the JMCHS."

The State responds to this argument by saying that the claim has been waived because it was not presented to the trial court or, if not waived, is without merit.

Tennessee Rule of Criminal Procedure 41(d) states, in pertinent part, as follows:

> Execution and Return With Inventory. The search warrant may only be executed by the peace officer, or one of them, to whom it is directed, and by no other person, except in aid of such officer, at the officer's request, he or she being present and acting in its execution.

In support of their argument that officers impermissibly delegated their search responsibilities, the defendants cite the opinion of the Idaho Supreme Court in State v. Card, 45 P.3d 838, 843 (Idaho 2002), which affirmed the suppression of a search warrant because the officers to whom it was directed had "played an extremely passive role" in allowing a supervisor from the state tax commission to read the search warrant to the occupants at two locations and then having his employees conduct the search, with the supervisor himself later preparing the warrant receipt, which he delivered to the magistrate. As further evidence of his central role in the search, the supervisor had crossed out the phrase "Caldwell Police Department" on the inventory of the seized items and written in the phrase "State Tax Commission." Id.

The claim that the search warrant should have been suppressed because officers allowed humane society officials too much responsibility in its execution was not alleged or argued before the trial court. Accordingly, that court made no findings as to this issue. Although witnesses were questioned to an extent at the suppression hearing and the trial as to the respective roles and duties of those present when the search warrant was executed, this matter was not sufficiently developed. Thus, we cannot determine, as Adkisson instructs that we must find plain error that a "clear and unequivocal rule of law" was breached; that "a substantial right of the accused" was adversely affected; that "the accused did not waive the issue for tactical reasons"; or that we must apply such an analysis "to do 'substantial justice.'" 899 S.W.2d at 641-42.

Accordingly, we conclude that this issue has been waived because it was not raised until appeal.

## II. Animal Cruelty Statute is Unconstitutionally Vague

The defendants argue that Tennessee Code Annotated section 39-14-202, the statute under which they were charged and convicted, is unconstitutionally vague. This statute provides, in pertinent part:

> (a) A person commits an offense who intentionally or knowingly:
>
> . . . .
>
> (2) Fails unreasonably to provide necessary food, water, care or shelter for an animal in the person's custody[.]

Tenn. Code Ann. § 39-14-202(a)(2) (1997).

In making this claim, the defendants rely primarily upon the opinion of the Washington Court of Appeals in State v. Jeanne Bright, No. 22071-7-II, 1999 WL 450916, at *1 (Wash. Ct. App. July 2, 1999), in which the court declared that the Washington animal cruelty statute which made criminal the failure "to provide [any animal] with the proper food, drink, air, light, space, shelter or protection from the weather" was unconstitutionally vague. The court explained:

> Here, the statute fails to define "proper . . . drink, air, light, space, shelter or protection from the weather." Former RCW 16.52.070. The dictionary's broad definition of "proper" as "marked by suitability, fitness . . . compatibility" and "adequate to the purpose" allows room for a wide variety of opinions as to whether any particular food or facility is suitable or appropriate, and thus legal or criminal. See Webster's Third New International Dictionary 1817 (1969). Consequently, whether a person's conduct violates this statute initially is dependent upon an enforcing officer's subjective opinion as to what is proper.
>
> . . . .
>
> Because the statute lacks guidelines, it permitted "'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" Without definition, qualification, or limitation of the terms "proper drink, air, light, space, shelter and protection from the weather, there are no enforcement guidelines.

Id. at *5 (citations omitted).

In the present appeal, the defendants assert that, as the Washington animal cruelty statute was unconstitutionally vague because of its use of "proper," so the Tennessee statute must be for its use of "necessary," arguing that this word renders the statute unclear as to whether it refers to that needed "for mere survival, for exhibition at the highest level of competition (such as the New York Kennel Club Show), or for something in between." The State disagrees that the Tennessee animal cruelty statute is ambiguous, citing language from People v. Speegle, 62 Cal. Rptr. 2d 384, 388 (Cal. Ct. App.1997), that "the terms 'necessary,' 'needless,' and 'proper' all give fair notice of an objective standard of reasonableness in the provision of sustenance, drink, and shelter, and in the avoidance of infliction of suffering."

In reviewing this issue, we first note that the Washington legislature subsequently has enacted an animal cruelty statute similar to that of Tennessee, both utilizing the word "necessary," the Washington statute providing:

(2) An owner of an animal is guilty of animal cruelty in the second degree if, under circumstances not amounting to first degree animal cruelty, the owner knowingly, recklessly, or with criminal negligence:

 (a) Fails to provide the animal with necessary food, water, shelter, rest, sanitation, ventilation, space, or medical attention and the animal suffers unnecessary or unjustifiable physical pain as a result of the failure; or

 (b) Abandons the animal.

Wash. Rev. Code Ann. § 16.52.207(2) (West 2003).

The defendant in Speegle, 62 Cal. Rptr. 2d at 388, the case relied upon by the State on this issue, argued that a statute very similar to that of Tennessee, was unconstitutionally vague:

> The defendant contends she was convicted of violating an unconstitutionally vague statute.  Specifically, she claims the prohibitions against depriving an animal of "necessary" sustenance, drink, or shelter; subjecting an animal to "needless suffering"; or failing to provide an animal with "proper" food or drink are so general that a person of common intelligence must necessarily guess at what course of conduct it is lawful to pursue.

Id. (citation and footnote omitted).

However, the court disagreed that the California statute was vague, concluding that the terms to which the defendant objected provided sufficient notice of what acts were proscribed:

> It is thus impossible for the Legislature to catalogue every act which violates the statute.  Nonetheless, the terms "necessary," "needless," and "proper" all give fair notice of an objective standard of reasonableness in the provision of sustenance, drink, and shelter, and in the avoidance of infliction of suffering.  The notice component of due process does not require any more.

Id.

Similarly, the defendant argued in People v. Allen, 657 P.2d 447, 449 (Colo. 1983), that an animal neglect statute was vague and overbroad, defining neglect as the "failure to provide food, water, protection from the elements, opportunity for exercise, or other care normal, usual, and proper for an animal's health and well-being."  However, the court disagreed, noting that these terms were common in animal abuse statutes:

All 50 states and the District of Columbia have enacted statutes outlawing cruelty to animals. Forty-three other jurisdictions have established a standard of care in terms identical to or synonymous with that of Colorado: "proper," "adequate," "sufficient," or "necessary." The remaining seven jurisdictions use a standard which is equally general: "neglect" or "unjustifiable pain, suffering or death." The drafters of the Model Penal Code stated that "[t]he obvious difficulty in defining cruelty cannot be solved by using more words, as the . . . typical legislative provision demonstrates," and resolved the dilemma in the Code by the use of "cruel mistreatment" and "cruel neglect." Model Penal Code § 250.6 comments to tentative draft No. 13 (1961).

Id. at 450-51 (footnotes omitted).

Applying the rationales of Speegle and Allen, we respectfully disagree with the defendants' contention that Tennessee Code Annotated section 39-14-202(a)(2) is vague because it utilizes the word "necessary." Similarly, we disagree that the defendants may utilize hypothetical situations to illustrate that the statute might be vague when applied to certain facts. Challenges of vagueness must be examined in light of the complaining party's conduct and the facts of the case at hand. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S. Ct. 1186, 1191, 71 L. Ed. 2d 362 (1982). A statute is not invalid simply because it may be arguably vague in a hypothetical instance but is clearly applicable to the complaining party. See id. Courts must indulge every presumption in favor of validity and resolve any doubt in favor of the constitutionality of a statute. See State v. Chavis, 617 S.W.2d 903, 905 (Tenn. Crim. App. 1980). The fact that a statute applies in a wide variety of situations and must necessarily use words of general meaning does not render it unconstitutionally vague. See State v. Lyons, 802 S.W.2d 590, 592 (Tenn. 1990).

We conclude that Tennessee Code Annotated section 39-14-202(a)(2) is sufficiently specific to warn the defendants of the proscribed conduct, and, accordingly, this assignment is without merit.

### III. Records of Jackson-Madison County Humane Society

The defendants argue that the trial court erred in determining that the records of the Jackson-Madison County Humane Society were "business records," as defined by Tennessee Rule of Evidence 803(6), which provides:

Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that

business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

As to this claim, the defendants present several arguments. They contend that there was "absolutely no indic[a]tion here that it is a 'regularly conducted business activity' for the JMCHS to go to a property and help law enforcement agencies remove over one hundred dogs" and that "neither the JMCHS nor the law enforcement officers identified the dogs in any reliable way as they were being removed from the property."

The records of which the defendants complain consist of the following printed forms:

(1) "Examination Checklist," a one-page document with blanks for inserting information such as the animal's breed, color, date of arrival, age, name of examiner, and reason for surrender, as well as option boxes to be checked under each of the following categories: coat and skin; eyes; ears; nose and throat; mouth, teeth, and gums; legs/paws; abdomen; breathing; urogenital; heartworm test; and fecal check, followed by a space for entering the animal's vaccination record. A separate untitled form appears to be a printout of the information input into a computer program from the examination checklist.

(2) "Observation Sheet," a one-page document with columns for entry of the date and observations as to the condition of the animal.

(3) "Heartworm Record," a one-page document for recording the giving of heartworm medication to the animal.

(4) "Jackson-Madison County Humane Society Animal Acceptance Form," a one-page document to be dated and with information to be provided as to the reason the animal came into the custody of the shelter; the type of animal; special information as to its traits and upbringing; and a surrender statement to be signed by the person formerly having custody of the animal.

This issue arose at trial during the presentation of the State's case. Following an objection by the defendant and a hearing out of the presence of the jury, the trial court determined that the documents which the State was seeking to utilize were business records of the JMCHS and, thus, admissible: "Ms. Garcia has stated that the person preparing that document was under a business duty to do so. She identified the person and said it was also done in the ordinary course of business, so I find those are admissible."

The defendants argue on appeal that the trial court erred in concluding that these were business records, contending that

> there is absolutely no indic[a]tion here that it is a "regularly conducted business activity" for the JMCHS to go to a property and help law enforcement agencies remove over one hundred dogs. Likewise, there is no showing that it was the "regular practice" for JMCHS to keep up with such a large number of dogs and create accurate records for each one. . . . Second, even if it could be said that the records were created in the ordinary course of business, it is very clear that the "method or circumstances of preparation indicate a lack of trustworthiness." Tenn. R. Evid. 803(6). Specifically, the record reveals that neither the JMCHS nor the law enforcement officers identified the dogs in any reliable way as they were being removed from the property. . . . Furthermore, the record reveals that Krueger was not present during the entire removal process . . . and Garcia was not present when the records were actually put together. Finally, no law enforcement officer inventoried the property that was removed from the premises.

The State responds to these arguments by saying that this issue has been waived because it was not raised in the motion for new trial and that, if not waived, the trial court was within its discretion in admitting the records. We will examine these claims.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). As our supreme court has explained:

> Because the term "discretion" essentially "denotes the absence of a hard and fast rule," we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'"

Gilliland, 22 S.W.3d at 270 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)). We review this issue, therefore, under an abuse of discretion standard.

Shanie Garcia testified that Jenny Krueger and Kimberly Lewis had the business duty to prepare the records. She said the preparation of such records was the "standard practice . . . on every animal within the facility or any animal that comes in the facility for any reason." Based upon this testimony, we conclude that the trial court did not err in determining that these documents were business records. Although the defendants argue on appeal that no showing was made that it was

normal practice for the JMCHS to go to another location and remove such a large number of dogs, we believe that the more relevant consideration is whether it was a normal practice to create intake records for each animal. The witnesses testified that this was the case. We would be engaging in speculation were we to conclude, as the defendants argue on appeal, that the records are inaccurate simply because a large number of dogs were taken from the defendants' premises. Accordingly, we conclude that the record does not show that the trial court abused its discretion in allowing these records as business records of the JMCHS. Thus, "plain error" did not result from the admission of these records.

## IV. Sufficiency of Evidence

The defendants were convicted of forty-seven counts of violation of Tennessee Code Annotated section 39-14-202, Cruelty to Animals, which provides in pertinent part:

> (a) A person commits an offense who intentionally or knowingly:
>
> . . . .
>
> (2) Fails unreasonably to provide necessary food, water, care or shelter for an animal in the person's custody[.]

The defendants argue that the evidence is insufficient to sustain their convictions both because "there was no evidence from which the jury could rationally infer that they acted intentionally or knowingly" and "there was no evidence that they acted unreasonably." As to the first component of this argument, they say that their cleaning schedule had been disrupted by rainy weather before the search warrant was executed; Tabitha Nicole Webb's health problems had prevented her cleaning the kennels on April 14, 2000; Dr. Kuhlman testified that the defendants' cleaning schedules were reasonable and the waste could have accumulated in one day; and the conditions of some of the dogs were common to the breeds. The defendants explain the second part of their argument by saying that Dr. Kuhlman's opinions were "better reasoned than Dr. White's"; the problems of most of the dogs "were easily remedied by mere bathing and dipping"; and the defendants "offered convincing explanations as to the dogs that did have substantial health problems." We will consider these arguments.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be

given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As to forty-seven of the dogs, the jury concluded, as proscribed by Tennessee Code Annotated section 39-14-202(a)(2), that the defendants had intentionally or knowingly "[f]ail[ed] unreasonably to provide necessary food, water, care or shelter" for their animals.  Witnesses told of the conditions in which the defendants were keeping the dogs inside the residence.  Investigator Gerald Wiltshire described the house as smelling "of urine, an ammonia-type smell" that burned his eyes, and said that it was "overwhelming."  He saw no food or water in any of the cages, and said that the bowl in the cage with the Doberman Pinscher with bandaged ears was "crusty" with "old and new feces."  Special Agent Tim Frank, testifying as to the dogs inside the house, said they "were either laying [sic] in or sitting in their own feces and urine that completely littered the bottom of the cages that they were in."  He said the odor was "unbearable," making his eyes water, and that he and Sergeant Wray opened the windows "to get some air in there."  Two Doberman Pinscher puppies in one of the cages had no food or water and "were basically living in their own feces and urine."  He filled their water dish two or three times because they "immediately drank all the water up."  The Doberman Pinscher with bandaged ears was "cower[ing]" and "kind of whimpering" in the corner of its cage because "there was so much feces and urine" in the cage.  Sergeant Wray described the conditions inside the house in similar language, saying that it was like "walking into an ammonia factory."  He, likewise, said the cages did not have any food or water.  Dr. Lisa White said the smell inside the house "would make your lungs kind of hurt almost as if you ha[d] breathed paint fumes, make your eyes start to sting."

As to the condition of the outside kennels, Investigator Wiltshire said that on top of the pea gravel which was spread on the ground was "feces that . . . was at least in some areas three or four inches thick that had turned white already."  He believed that every dog had ticks and some appeared

to have eye problems. He could smell "the dogs and the stench of the feces," and did not see food or water in the kennels, although it was possible that there was water. Special Agent Frank said that the dogs in the kennels "had no food, no water" and the pens were "littered with feces."

The defendants argue that the State failed to present evidence that they acted intentionally, knowingly, or unreasonably; and, previously, we have set out their bases for these claims. However, the jury was not required to accept the testimony of the defense witnesses, including the claim of Sandra Webb as to the cleaning procedures for the cages and kennels, or the opinions of Dr. Kuhlman. Further, although the defendants contend that, as explained in their reply brief, "a person cannot be found guilty under the statute if the animals do not have serious health problems requiring veterinary care," Tennessee Code Annotated section 39-14-202(a)(2) does not contain such a requirement. Rather, it proscribes "[f]ail[ing] unreasonably to provide necessary food, water, care or shelter for an animal in the person's custody." Taken in the light most favorable to the State, the proof established this. Accordingly, we conclude that the proof is sufficient to support the convictions.

## V. Post-Verdict Issues

Because of the complicated post-trial events in this matter, we will set out a chronology of the matters occurring after the trial.

The jury returned their verdicts on December 7, 2000, convicting the defendants on forty-seven counts, finding them not guilty on sixteen counts, and being unable to reach a verdict on thirty-eight counts. On that day, the trial court ordered the defendants not to possess or have custody of animals until further orders of the court and scheduled the sentencing hearing for January 2, 2001. On December 19, 2000, the trial court held a hearing as to the forfeiture of the dogs which were the subject of the guilty verdicts and ruled that they were forfeited to the JMCHS, pursuant to Tennessee Code Annotated section 39-14-202(d), and that it would retain custody of the remaining dogs as well. At the January 2, 2001, sentencing hearing, the court, in addition to sentencing the defendants, ordered that they were not to possess animals for ten years and allowed them ninety days in which to find new owners for the dogs which had not been the subjects of guilty verdicts. The judgments for the convictions ordered that the defendants pay restitution of $39,978.85 to the JMCHS. On January 10, 2001, the trial court issued arrest warrants for the defendants based upon their allegedly being in possession of additional animals at their premises, in violation of the orders of the court. A hearing was held on January 16, 2001, following which the trial court revoked the defendants' sixty-day community corrections sentences and ordered that each serve the sentences of eleven months, twenty-nine days imposed on January 2, 2001. A notice of appeal was filed on February 23, 2001, as to the trial court's revocation of the defendants' community correction sentences. Another notice of appeal was filed on March 12, 2001, as to the trial court's denial of the motion for new trial. On April 9, 2001, the trial court entered an order finding that the defendants had not complied with the April 2 deadline for a disposal plan as to the dogs not the subjects of guilty verdicts and ordering that these dogs were forfeited to the JMCHS, with the trial court filing an amended order as to this matter on April 26, 2001. The defendants filed a notice of appeal on May 9, 2001, as to

the trial court's denial of their plan for disposal of the dogs not the subjects of guilty verdicts and ordering that these dogs be forfeited to the JMCHS.

## A. Initial Order of Confinement for Sixty Days

The jury returned with their verdicts on December 7, 2000. Initially, the trial court ordered that each defendant be confined for sixty days, with the remainder of the sentences suspended. In sentencing the defendants, the trial court stated as follows:

> Now, in a misdemeanor, of course, there are no presumptive sentences. I'm going to sentence each of these Defendants to . . . eleven months twenty-nine days at seventy-five percent for each count.
>
> Now, [defense counsel] talked about the Statute Number[,] I believe it's 40-35-103, dealing with sentencing considerations, as to whether or not all this time should be suspended.
>
> Part (2) of that says: Confinement is necessary to avoid depreciating the seriousness of the offense. I've listened [to] all the proof in this case and I think part of what I have to do here concerns other people in this county. And I feel like that if I fully probate this sentence, it's going to send the wrong message. I think confinement is necessary under 40-35-103(b), to avoid depreciating the seriousness of this offense. And also the second part of that is particularly suited providing effective deterrence to others in this county likely to commit a similar offense.
>
> So I'm going to suspend all of this time except for sixty days. Sixty days will be served by each Defendant.
>
> Now, as to the fines, of course, the Court has the authority to either impose the fines assessed by the jury or any amount less than that. There were five of these dogs that were treated in a particularly egregious manner. That's numbers 21, 28, 40, 91, and 101. I'm not going through the descriptions. But as to each [of] those dogs a fine of one thousand dollars as to each of the Defendants was imposed. I'm going to uphold the fines assessed by the jury.
>
> I'm going to order each of these Defendants to do fifty hours of community service.

The defendants argue that, in initially sentencing each to confinement for sixty days instead of granting full probation, the trial court erred by not considering the enhancement and mitigating factors, in relying upon the "deterrence" effect of the sentences, and in ordering confinement to avoid "depreciating the seriousness of the offense," saying that the offenses were not "serious" when compared with other animal cruelty cases.

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302. This court's review of a misdemeanor sentence is *de novo* with a presumption of correctness. State v. Troutman, 979 S.W.2d 271 (Tenn. 1998). Although the Sentencing Reform Act typically treats misdemeanants and felons the same, misdemeanants are not given the presumption of a minimum sentence. See State v. Seaton, 914 S.W.2d 129, 133 (Tenn. Crim. App. 1995). Our supreme court outlined the procedures for misdemeanor sentencing in Troutman, 979 S.W.2d at 273-74:

> The sentencing considerations generally used in determining the manner of service for both misdemeanors and felony sentences are codified at Tenn. Code Ann. §§ 40-35-102, -103. See Tenn. Code Ann. § 40-35-102 (noting considerations used in determining whether confinement shall be imposed); Tenn. Code Ann. § 40-35-103 (setting forth considerations to be used when issuing sentencing of confinement). In addition to the statutory considerations for issuing sentences of confinement, the misdemeanor sentencing statute merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement. Compare Tenn. Code Ann. § 40-35-302 ("to consider the purpose of this chapter, the principles of sentencing, and the enhancement and mitigating factors set forth herein") with Tenn. Code Ann. § 40-35-210(f) (stating court shall place on record either orally or in writing what enhancement or mitigating factors it found).

Although a separate sentencing hearing is not required in misdemeanor sentencing, the trial court must "allow the parties a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." Tenn. Code Ann. § 40-35-302(a) (1997). A misdemeanor sentence, unlike a felony sentence, has no sentence range. State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997). Since trial judges are able to assess the credibility of a defendant firsthand, they must be given considerable discretion in determining the proper sentence for a misdemeanor offense.

A trial court has great flexibility in fashioning a misdemeanor sentence. A trial court may place a defendant on probation after a term of continuous confinement, after a term of periodic confinement, or immediately after sentencing. Tenn. Code Ann. § 40-35-302(e) (1997). Tennessee Code Annotated section 40-35-103(1) governs whether a trial court should impose a sentence of confinement:

Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently have been applied unsuccessfully to the defendant[.]

When a trial court imposes a sentence, it must set a percentage of the sentence to be served by the defendant; once the defendant serves this percentage, then he or she is eligible for rehabilitative programs. Tenn. Code Ann. § 40-35-302(d) (1997). In setting the percentage of the sentence to be served in confinement, the trial court considers the sentencing principles and purposes of the Sentencing Reform Act of 1989 as well as the relevant enhancement and mitigating factors. Id.

The defendant is correct that the trial court did not make explicit findings of enhancement and mitigating factors; however, it was not required to do so in misdemeanor sentencing. Troutman, 979 S.W.2d at 274. We cannot conclude that the trial court erred in initially sentencing the defendants to confinement for sixty days.

## B. Award of Restitution to Jackson-Madison County Humane Society

At the sentencing hearing, the trial court also ordered that the defendants pay restitution of $39,978.85, to the JMCHS. As to this award, the defendants argue on appeal that the JMCHS was not a "victim," as defined by Tennessee Code Annotated section 40-38-203, and that the trial court, in setting the restitution amount, failed to consider the ability of the defendants to pay. We will consider these arguments.

At the sentencing hearing on January 2, 2001, the trial court gave the defendants ninety days in which to sell the dogs which had been the subjects of indictments for which the defendants were found not guilty or which had resulted in a hung jury. The court explained the basis and rationale for ordering that the defendants pay restitution to the JMCHS:

Now, as to the restitution, I have thoroughly reviewed this Alford case and I think there's some – some reason to differentiate the treatment of that case and this one.

Of course, the victims in this case are the dogs. There are no human victims. Our statute talks about human victims. I even went back and read what Senator Roy Herron said when he was a State Representative when that Statute 39-14-202 was amended.

Also, based on the statute that I brought up, 39-14-210(e), I'm going to order restitution to the Humane Society in this case, up to the amount set forth in Collective Exhibit 3. However, I am going to go through that exhibit. Our law only provides that restitution be provided for special damages, not general damages.

Based on what I've heard, there may be some matters in that Collective Exhibit 3 that – for which the Humane Society should not be reimbursed. But I think from what I've heard, most of it the Humane Society should be reimbursed.

Also I think under part (e) of 39-14-210 it says . . . I believe this statute applies. Any Humane Society chartered by the State and to whose custody shall lawfully come any animal – I don't think there's any question that these animals lawfully came into custody of the Humane Society – shall have a lien on that animal for the reasonable value of the goods and services necessarily rendered by or at the instance of the Society to that animal.

So as we go through this procedure and attempt to sell these animals, I think, based on that statute, the entire amount could be subtracted or basically repaid to the Humane Society for whatever – if there's that much that's actually derived from the commercial reasonable sale of the animals.

If not, I'll consider which parts of Collective Exhibit 3 should apply and which parts the Humane Society should be reimbursed for as special damages in this case.

### 1. JMCHS as the "Victim"

In our review of this issue, we first will consider the relevant statutes.

Tennessee Code Annotated section 40-35-304 provides that a trial court may order a defendant to pay restitution and establishes certain procedures for when the court does so:

> (a) A sentencing court may direct a defendant to make restitution to the victim of the offense as a condition of probation.

(b) Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss.

(c) The court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments. The court may not establish a payment or performance schedule extending beyond the statutory maximum term of probation supervision that could have been imposed for the offense.

(d) In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform.

Tennessee Code Annotated section 40-38-203(1) defines "victim":

As used in this part, unless the context otherwise requires:

(1) "Victim" means an individual who suffers direct or threatened physical, emotional, or financial harm as the result of the commission of a crime, or an immediate family member of a minor victim or a homicide victim[.]

Tennessee Code Annotated section 39-14-202(d) provides that, following a conviction for cruelty to animals, the trial court shall order that custody of the animals which were the basis for the conviction be given to a humane society:

In addition to the penalty imposed in subsection (f), the court making the sentencing determination for a person convicted under this section shall order the person convicted to surrender custody and forfeit the animal or animals whose treatment was the basis of the conviction. Custody shall be given to a humane society incorporated under the laws of this state. The court may prohibit the person convicted from having custody of other animals for any period of time the court determines to be reasonable, or impose any other reasonable restrictions on the person's custody of animals as necessary for the protection of the animals.

Tennessee Code Annotated section 39-14-210, in pertinent part, establishes that certain fines, penalties, and forfeitures from animal cruelty prosecutions inure to humane societies, that they have

liens upon animals coming into their custody, and that victimized animals "shall be placed in their custody":

> (d) All fines, penalties and forfeitures imposed and collected in any county, under provisions relating to or in any way affecting animals, shall inure to such society in aid of the purpose for which it was incorporated, and no injunction shall be granted against such society or attorney or its officers or agents, except upon motion, after due notice and hearing.
>
> (e) Any humane society chartered by the state, into whose custody shall lawfully come any animal, shall have a lien on that animal for the reasonable value of the goods and services necessarily rendered by, or at the instance of, the society to that animal.
>
> (f) Custody of any animal victimized under this part shall be placed with any humane society chartered by the state immediately upon arrest of the person alleged to have violated this part. The humane society shall assist the animal and preserve evidence for prosecution.

We believe that Tennessee Code Annotated section 39-14-210(f) is determinative as to this issue, by requiring that victimized animals shall be placed with state-chartered humane societies. The creation of this obligation removes the JMCHS from the status of a volunteer or Good Samaritan and, obviously, results in costs and expenses to a society as a result of this mandated responsibility. Accordingly, we conclude that the humane society is a "victim" within the intent of the statutes and is entitled to restitution.

### 2. Setting of Restitution Amount

The defendants argue that the trial court erred in setting the amount of restitution without considering their means and ability to pay the sum of $39,978.85. The State responds that, although a notation in her presentence report states that "she is in chapter 13 bankruptcy," Sandra Webb presented "no proof that this was true." Likewise, the State argues that Tabitha Nicole Webb did not establish that she was unemployed other than by choice. The State points out that both defendants are high school graduates and "acquired a sizable sum of money because the trial court ordered them to sell their dogs."

In State v. Bottoms, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001), this court explained the considerations of the trial court in ordering payment of restitution:

> In determining the amount and method of payment of restitution, the trial court must consider "the financial resources and future ability of the defendant to pay or perform." Tenn. Code Ann. §

-45-

40-35-304(d); see also State v. Johnson, 968 S.W.2d 883, 886 (Tenn. Crim. App. 1997) ("[T]he trial court, in determining restitution, must also consider what the appellant can reasonably pay. An order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim."); State v. Smith, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994) ("The trial court must further set an amount of restitution that the appellant can reasonably pay within the time that he will be within the jurisdiction of the trial court.").

Collective Exhibit 3 to the sentencing hearing is a detailed listing of the expenses incurred by the JMCHS as a result of its treating and boarding the dogs which were the subjects of guilty verdicts. The expenses are set out for each dog, with the total amount being $39,978.85. As explained by the trial court, the procedure for payment of restitution was that the dogs were to be sold within ninety days after the sentencing hearing, with the sale proceeds to be applied to the humane society expenses.

Until this was completed, and unless the sale proceeds were less than the amount of restitution to be paid, the assets of the defendants would not be looked to. The record on appeal does not contain information as to how much was obtained as a result of the sale of the dogs. Thus, we are asked to determine on appeal whether the trial court sufficiently considered the defendants' ability to pay restitution of $39,978.85 when the record before us does not reveal the actual amount, if any, which they were to pay from their personal assets. In fact, it would not appear that this issue would have been resolved until sometime after the convictions had been appealed. Accordingly, we conclude that the record is insufficient for us to resolve this issue. We fully recognize that the trial in this matter occurred nearly two and a half years ago and that the restitution issue likely was resolved in some fashion nearly two years ago. Thus, while a remand for the taking of further proof would result in additional delay, the restitution issue raised by the defendants cannot be resolved without a hearing to determine how much was received from the sale of the dogs and the assets and abilities to pay restitution of the defendants. Accordingly, we remand this matter for a hearing as to the restitution issue raised by the defendants.

### C. Ten-Year Prohibition of Defendants' Having Custody of Animals

At the sentencing hearing, the State argued that the defendants should be prohibited from ever possessing animals. However, the trial court explained why the defendants would not be allowed to have custody of animals for a period of ten years:

Let me just address the issues in the order that the parties did. First, under 39-14-202, of course, it allows the Court to preclude these Defendants from having custody of other animals for any period of time the Court deems reasonable.

And there's no question that some of those dogs were treated in an egregious manner, you know. In fact, . . ., the jury itself treated five of the dogs in a different manner from the other forty-three for the convictions because there were five dogs for which a fine of one thousand dollars per Defendant was suggested or rendered by the jury.

After what I've heard I think I have to preclude these Defendants from possessing animals for some reasonable period of time.

The State asked for . . . basically a life sentence here. I think that's too much. What I'm going to do is – Based on what I've heard on how these animals were treated, I'm going to preclude these Defendants from having animals for a period of ten years.

At the end of that time they may petition this Court to ask for permission to again have animals in some capacity. And basically I'm setting forth two years for each of these five animals that were treated so horribly. We heard the evidence of that.

The defendants argue on appeal that this ten-year ban is unreasonable and violates their rights to due process of law, an argument with which the State disagrees.

Tennessee Code Annotated section 39-14-202(d) provides:

In addition to the penalty imposed in subsection (f), the court making the sentencing determination for a person convicted under this section shall order the person convicted to surrender custody and forfeit the animal or animals whose treatment was the basis of the conviction. Custody shall be given to a humane society incorporated under the laws of this state. The court may prohibit the person convicted from having custody of other animals for any period of time the court determines to be reasonable, or impose any other reasonable restrictions on the person's custody of animals as necessary for the protection of the animals.

The record on appeal establishes that the defendants kept a large number of dogs in horrendous conditions. Even after their convictions and being ordered by the trial court that they were not to have custody of animals, they did so. Under these circumstances, we cannot conclude that the trial court's ten-year ban is unreasonable.

### D. Ordered Sale of Additional Dogs

The defendants argue that the trial court erred in ordering that they dispose of the dogs remaining in their custody which were not the subject of a guilty verdict.

Tennessee Code Annotated section 39-14-202(d) provides that, following a conviction for cruelty to animals, "[t]he court may prohibit the person convicted from having custody of other animals for any period of time the court determines to be reasonable, or impose any other reasonable restrictions on the person's custody of animals as necessary for the protection of the animals."

Tennessee Code Annotated section 39-14-210(f) provides that the custody of a "victimized" animal "shall be placed with any humane society chartered by the state immediately upon arrest of the person alleged to have violated" the cruelty to animal statutes. Upon receiving custody, "[t]he humane society shall assist the animal and preserve evidence for prosecution." Combining this subsection with Tennessee Code Annotated section 39-14-202(d), we conclude that the trial court had the authority to order the forfeiture of the animals which were the subjects of not guilty verdicts. We note that the trial court directed that the defendants submit a plan for the disposition of these dogs and, following a hearing, determined that the plan was not acceptable. The court noted at the hearing the two competing interests, that of the defendants in the dogs which were the subjects of the not guilty verdicts and the order of the court that they not possess animals for a period of ten years. The court observed that a dog "is not a car that we can set in the law enforcement lot and leave it for a year and a half while the appeal goes forward." The court found that "the Defendants failed unreasonably to provide necessary food, water, care or shelter for all of the animals in their custody." The record on appeal supports this finding.

Although the defendants argue that the trial court was without authority to order the forfeiture of these dogs, they do not suggest what action would have been appropriate. We have affirmed the trial court's ten-year ban on the defendants having custody of animals. Taking together that order and the applicable statutes, we conclude that the trial court was within its authority in ordering the forfeiture of the dogs which were the subjects of not guilty verdicts.

### E. Revocation of Community Corrections Sentences

The defendants argue that the trial court erred in revoking their initial sentences of sixty days confinement and ordering that no part of their eleven-month-twenty-nine-day sentences be suspended. The State responds that the revocations were justified.

On December 7, 2000, following the jury's return of its verdicts, the trial court instructed the State to prepare an order providing that the dogs which were the subject of the verdicts of guilty should be forfeited to the JMCHS and that the defendants were not to possess animals:

> [Assistant District Attorney General], I want you to enter an order
> setting forth my previous ruling as to the dogs upon which we have

a conviction. Also place in that order that the Defendants are not to have any dogs or animals of any kind in their custody until the sentencing hearing.

Although the record on appeal does not contain a transcript of a December 19, 2000, hearing as to the forfeiture of the dogs, an order of the trial court, entered and filed on December 19, 2000, states in part "that the defendants[] are hereby prohibited from possessing any animals from December 7, 2000, unless and until otherwise ordered by this Court," and sets the sentencing hearing for January 2, 2001.

At the January 2, 2001, sentencing hearing, the trial court, following extended arguments as to a prohibition on the defendants' having animals on their premises, ordered that for a period of ten years, the defendants were "preclude[d]" from having animals and, at the end of that time, could petition the court "for permission to again have animals in some capacity." The judgments reflecting the sentences and conditions were entered on January 10, 2001, with corrected judgments entered on January 24, 2001, reflecting that the defendants were to perform fifty hours of community service work.

On January 10, 2001, the trial court issued warrants for the arrest of the defendants, based upon the affidavits of Angie Adrian, Community Corrections Case Officer, which stated as to Tabitha Nicole Webb: "During a routine home visit on 1/10/01, 15 dogs and 1 cat were found at the residence of Tabitha Webb," and as to Sandra Kay Webb: "During a routine home visit on 1/10/01 the defendant was in possession of 15 dogs and 1 cat. The defendant was court ordered not to be in possession of any animals."

On January 16, 2001, a hearing was held on the State's request to revoke the split confinement sentences. Although the hearing was not transcribed, the trial court filed a lengthy written order revoking the defendants' community corrections sentences and setting out the chronology and details of the revocations. In that order, the trial court set out the testimony of Angie Adrian, the community corrections officer assigned to the defendants, who said that she had gone to their property because they had not contacted her. She saw Sandra Webb at the gate and was invited inside the defendants' residence where she saw four dogs running loose, one dog in a kennel in the living room, and three kennels in another part of the house, one containing three Boxers, the second with a Doberman Pinscher, and the third with a Doberman Pinscher and a Great Dane. She said that there were two other dogs inside the house and two more outside. In total, there were fifteen dogs and one cat at the defendants' premises. Amanda Davis, who also lived on the property, told Adrian that the animals belonged to her. Lieutenant Donna Turner testified that she also saw fifteen dogs and one cat at the defendants' premises.

Testifying for the defense was Amanda Davis, who said that she had lived with the defendants since July 2000 and the animals belonged to her. She said that four of the dogs had been received in July 2000, and nine had come between that date and the revocation hearing. Davis said

that she paid no rent and the defendants paid for food and veterinary care for the dogs inside the house.

In its order revoking the community correction sentences, the trial court found that the defendants had been ordered orally on December 7, 2000, by written order on December 19, 2000, and orally at the sentencing hearing on January 2, 2001, not to have custody of any animals. The court found that the animals at the defendants' residence "were clearly in their possession and custody. . . . They were paying the veterinary bills, the food bills, and were providing overall care for the dogs." The court found the testimony of Amanda Davis "incredible to the extent that she stated she was the owner and possessor of the dogs," finding that the defendants were in actual possession of the dogs, or, at least, constructive and joint possession. The court concluded that the "Defendants violated the terms of their Community Corrections sentence by a preponderance of the evidence in a substantial way. This is the most blatant violation of a Court's order and sentence in the experience of this Court." Accordingly, the court revoked the defendants' community corrections sentences and ordered that they serve their entire sentences in confinement.

As to their revocations, the defendants argue on appeal that "by abruptly revoking their community corrections sentences based on a single technical violation for which there were serious countervailing considerations, the trial court deprived the [defendants] of the opportunity to abide by the program and demonstrate their potential for rehabilitation." To support this argument, the defendants assert on appeal that the dogs belonged to Amanda Davis, and the defendants "were simply doing her a favor by allowing her and her animals to stay temporarily in the house." Additionally, the defendants argue that the "situation was exacerbated by the fact that Davis had no money and no where else to go," and the defendants "realized that they were not supposed to have custody of any dogs, and were doing their best to arrange for alternative accommodations for the animals when the community corrections officer arrived on the property." Further, in their reply brief, the defendants argue that "the trial court failed to adequately explain what conduct was prohibited under the sentence," asserting that "the court's rulings easily could have led Defendants to believe that they were prohibited only from having legal ownership of other animals, not that they were prohibited from having mere custody of such animals."

The problem with these arguments is that they are unsupported by the record. Since there is no transcript in the record on appeal of the revocation hearing, there is no basis for the defendants now contending that Amanda Davis and her animals were living with the defendants only on a temporary basis, or that they "were doing their best to arrange for alternative accommodations for the animals" when the community corrections officer came to the premises unannounced. Additionally, as to the legal distinctions made on appeal between possession, ownership, and custody, we note that the defendants have made no references to the record that they or their counsel ever sought clarification from the trial court as to its allegedly ambiguous orders as to animals being on their premises. We note further, as to this argument, that it was not made at the revocation hearing, but, rather, presented for the first time in the defendants' reply brief. As stated in State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993), "[a]n appellant cannot change theories from the

trial court to the appellate court."  Accordingly, we conclude that the argument as to legal ownership versus mere custody is not properly before this court.

The primary purpose of the Community Corrections Act of 1985 is to "[e]stablish a policy within the state to punish selected, nonviolent felony offenders in front-end community based alternatives to incarceration, thereby reserving secure confinement facilities for violent felony offenders[.]"  Tenn. Code Ann. § 40-36-103(1) (1997).  The program offers a flexible alternative beneficial to both the defendant and society.  State v. Griffith, 787 S.W.2d 340, 342 (Tenn. 1990).

Once the defendant violates the terms of his community corrections sentence, the trial court may revoke the sentence and impose a new one.  Tennessee Code Annotated section 40-36-106(e)(4) grants the trial court the authority to resentence a defendant following the revocation of the original sentence.  The court "may resentence the defendant to any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed, less any time actually served in any community-based alternative to incarceration." Tenn. Code Ann. § 40-36-106(e)(4) (Supp. 2000).

Revocation of a community corrections sentence occurs upon finding by a preponderance of the evidence that the defendant has violated the conditions of the agreement.  State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991).  "The judgment of a trial court in this regard will not be disturbed on appeal unless it appears that there has been an abuse of discretion."  Id.  For a reviewing court to find an abuse of discretion, it must be shown that the record contains no substantial evidence to support the trial judge's conclusion.  Id.

We conclude that the trial court did not abuse its discretion in revoking the defendants' community corrections sentences and ordering that each be confined for the term of her sentence.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court, but remand for entry of a corrected judgment showing that the defendants were acquitted of Count 8 and for an evidentiary hearing as to the ordering of restitution.

_____
ALAN E. GLENN, JUDGE