IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 25, 2014

**STATE OF TENNESSEE v. ADONTA LASHA GRIGGS**

**Appeal from the Circuit Court for Blount County**
**Nos. C-21591 & C-21592     David R. Duggan, Judge**

_____

**No. E2013-01961-CCA-R3-CD - Filed March 25, 2014**

_____

The Defendant, Adonta Lasha Griggs, appeals as of right from the Blount County Circuit Court's revocation of his community corrections sentence and order of incarceration. The Defendant contends (1) that the trial court abused its discretion in revoking his community corrections sentence because there was not "sufficient evidence" for the trial court to conclude a violation occurred and (2) that even if a violation occurred, the trial court abused its discretion by placing his original sentence into effect, instead of ordering a sentence of split confinement. Following our review, we affirm the trial court's revocation of the Defendant's community corrections sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal); and Mack Garner, District Public Defender, and George Waters, Assistant District Public Defender (at hearing), for the appellant, Adonta Lasha Griggs.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Mike Flynn, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On March 25, 2013, the Defendant was charged by criminal information with sale or delivery of less than .5 grams of a Schedule II controlled substance on December 7, 2011, and another count of sale or delivery of less than .5 grams of a Schedule II controlled substance on December 13, 2011, a Class C felony. The Defendant entered into a negotiated

plea agreement that same day. Pursuant to the agreement terms, he pled guilty to both counts and, in exchange, received a five-year sentence, at thirty percent release eligibility, with the sentence to be served on community corrections after service of eighty days in jail.[1]

Three days later, on March 28, 2013, the first violation warrant was filed against the Defendant. The allegations contained in that warrant were that the Defendant violated the conditions of his community corrections sentence as follows: "Rule #5 By Admitting to use of 'Weed and Roxy's['] w[ith]in the past 2 days on 3/26[/]13. Tested positive for THC, Cocaine, Opiates, Amphetamines, OXY and K2 on 3/26/13"; "Rule #6 By Fraternizing with people who use, deal, or traffic[] illegal substances"; and "Rule #12 By failing to obey the laws of the United States when he used illegal drugs." The trial court sustained the violation on April 26, 2013, partially revoking the Defendant's sentence by ordering him to serve seventeen days' incarceration before returning to the Community Corrections Program.

A second violation warrant was filed on July 10, 2013. This time it was alleged in the warrant that the Defendant violated the conditions of his sentence in the following respects: "Rule #6 By having a person know[n] to deal/sell drugs staying at his house"; "Rule #7 By having ammunition in his house"; "Rule #12 By having Drug Paraphernalia in his pants"; and "Rule #12 By having large amounts of cash in amounts known for drug transactions $501.00." A revocation hearing on this warrant was held.

At the hearing, Alcoa Police Department Officer Brett Hayden Romer testified that he executed a search warrant at the Defendant's girlfriend's home on July 10, 2013. The search warrant was entered as exhibit at the hearing. The affiant averred in the warrant that items "consistent with the use and sale of crack cocaine and cocaine" had been discovered in the trash from the residence within the preceding seventy-two hours. The officers were searching for "cocaine, crack cocaine, drug paraphernalia, monies from illegal drug sales, papers, documents, electronic documents, stolen property/guns, and evidence of dominion and control[.]"

Officer Romer testified that the Defendant, his girlfriend, and several children were present at the time of execution. When the officers entered, the Defendant stood up from the couch, and $501.00 in "cash just kind of spilled out into the couch" from the Defendant's person. They also searched a joint closet shared by the Defendant and his girlfriend where they found a "corner baggie," a cut straw, and two razor blades inside a pair of male pants. Officer Romer testified that these items were commonly associated with "use or sale of crack

---

[1] The guilty plea transcript is not included in the record on appeal, and we cannot discern from the record the factual bases for these offenses.

cocaine." The officers also found in a shoebox above the Defendant's clothes two "unspent[,]" .38-caliber bullets.

Officer Romer talked with the Defendant while the officers were continuing to search, and the Defendant mentioned the name "Chico Echols." According to Officer Romer, "Mr. Echols actually ended up backing out with the neighbor and never really showed up at the house while [the officers] were there executing search warrants."[2] Officer Romer inquired if Mr. Echols had been staying with the Defendant or "hanging out there," and the Defendant said that Mr. Echols "came over and . . . mowed the lawn." The Defendant further stated that Mr. Echols had stayed the night. In Officer Romer's opinion, it appeared that Mr. Echols visited "rather frequently." Officer Romer advised the Defendant that Mr. Echols was a convicted felon and that their association was a violation of the Defendant's sentence, to which the Defendant responded, "[W]ell, he just comes to cut my yard, he doesn't really hang out." Officer Romer thought this subsequent statement by the Defendant "was more or less polar opposite of what had already been said."

The Defendant also told Officer Romer that "he had no idea where the ammunition came from. He also mentioned that the corner baggie, the cut straw, and the two razor blades were potentially from a long time ago. He wasn't sure about them." On cross-examination, Officer Romer confirmed that there did not appear to be any "residue" on the razor blades. Additionally, the officers found prescription narcotics during the search of the Defendant's girlfriend's residence, "four dosage units of white round pills, labeled 'Watson 749.'" Ultimately, the Defendant's girlfriend was charged with possession of the prescription pills. Officer Romer confirmed that the Defendant was cooperative with the officers during the search.

The Defendant testified on his behalf at the revocation hearing. According to the Defendant, he had lived with his girlfriend since October 2011. Regarding the items discovered during the search of his girlfriend's home, the Defendant first explained,

> I ain't never seen no bullets and my girl had just cleaned the closet because she had just put all my shoes on my side. The only thing on my side is just my shoes and on the other side is her clothes and boxes and stuff. She told me that the bullets was in the boxes with some pictures and a lot of paperwork and her kids' pictures when they was little. Ain't nothing on my side but some shoes and some pants with some shorts that I had up in the closet. But she just cleaned out the closet. She just put my stuff up there.

---

[2] The officers were executing two search warrants that day—one at the Defendant's girlfriend's residence, and another at "the residence that set [sic] kind of adjacent" to the Defendant's girlfriend's.

Because since she'd been pregnant I've been sleeping . . . in the living room anyway, on the floor. So . . . and I ain't never owned no .38.

He also claimed that "[a]ll [his] stuff was in a bag" and that his girlfriend had "just put" his clothes in the closet to make more room in the living room. Moreover, the Defendant stated that he believed the officers found the baggie in his girlfriend's daughter's bedroom and that they used those baggies "to put their food and stuff in." According to the Defendant, the two razor blades were found in "an old pair of pants" that he "used to wear, before [he] got on probation." Regarding the straw and the drug paraphernalia, his girlfriend told him that she had been charged with possession of those items.

The Defendant stated that he had been attending drug treatment programs, which included intensive outpatient classes, "rehab[,] and therapy"; taking parenting classes; and "passing [his] drug tests and everything." He further conveyed that he reported to the community corrections office once a week. He stated that he was employed by Rubbermaid but was "laid off because [he] had to leave and go to [his] classes[.]" Following his unemployment, the Defendant's community corrections officer told him to "start doing [his] community service[,]" which he stated he had been doing. Before working for Rubbermaid, which employment lasted about a month, the Defendant stated that he did forty hours of community service at Goodwill, and then following his Rubbermaid job, he had reported to "the Boys' and Girls' Club from 6:00 to 8:00" daily. The Defendant stated that he had no felony convictions prior to his guilty plea in this case, only having a misdemeanor trespassing conviction and serving jail time for failure to pay child support.

The Defendant asserted that he would like to stay in the Community Corrections Program and intended "to keep doing all [he had] been doing; staying out of trouble and taking care of [his] kids, and keep going to [his] classes and everything." He claimed that he was taking strides to obtain a different residence, that he had been drug-free for four months, and that his prior drug usage only lasted "[a]bout a year, year and half."

On cross-examination, the Defendant was questioned about the circumstances of his prior violation, which occurred immediately following his guilty plea. He confirmed that he was "not clean" on the day he entered his plea. He told his community corrections officer about some of his usage of certain drugs, but not all of the drugs that he actually tested positive for that day. Following the violation, the Defendant was returned to the Community Corrections Program, and this search warrant was executed three months later.

The Defendant claimed he had no knowledge of how the police obtained baggies that contained cocaine from his trash earlier that month. He also stated that he did not know Mr. Echols was a convicted felon and conveyed that Mr. Echols was a relative of the Defendant's

girlfriend's son. The Defendant confirmed that Mr. Echols was found on the Defendant's front porch just several hours after the search but claimed that he was informing Mr. Echols at that time that Mr. Echols could no longer visit the residence.

After finding that the Defendant had violated the terms of his community corrections sentence, the trial court revoked the Defendant's community corrections placement and ordered him to serve the remainder of his original sentence in confinement. The trial court also granted the Defendant credit for previous jail and program time. The Defendant perfected a timely appeal.

ANALYSIS

The Defendant contends that the trial court erred in revoking his community corrections sentence, arguing that "there was not sufficient evidence presented for the trial court to conclude a violation by a preponderance of the evidence." Specifically, he notes that there was not "sufficient evidence" for the trial court to conclude that the razor blades were used as drug paraphernalia or that the Defendant was aware of them; that there was not "sufficient evidence" that the Defendant was aware of the bullets found in the shoebox; that no cocaine or weapons were found in the home; that his girlfriend was charged with possession of the pills discovered during the search; that there was "not specific conclusive evidence" of Mr. Echols' criminal history and reputation presented; and that there was "no evidence" that the Defendant knew of Mr. Echols' reputation or criminal history. Moreover, the Defendant submits that even if a violation occurred, "under the facts of this case, some smaller penalty of split confinement followed by return to community corrections would be more appropriate" than total incarceration; he cites to his performance while in the Community Corrections Program of reporting to the community corrections office, attending classes, preforming community service, and passing his drug screens. The State responds that the court properly revoked the Defendant's community corrections sentence and ordered total incarceration.

The Tennessee Supreme Court has held that the same principles that apply in the revocation of probation also apply in the revocation of community corrections. State v. Harkins, 811 S.W.2d 79, 83 (Tenn. 1991). The revocation of community corrections, like the revocation of probation, rests within the sound discretion of the trial court. Id. An appellate court will uphold a trial court's decision to revoke probation or community corrections absent an abuse of discretion. State v. Beard, 189 S.W.3d 730, 735 (Tenn. Crim. App. 2005); State v. Webb, 130 S.W.3d 799, 842 (Tenn. Crim. App. 2003) (quoting Harkins, 811 S.W.2d at 82).

Pursuant to Tennessee Code Annotated section 40-35-311(e), the trial court is required only to find that the violation of a community corrections sentence occurred by a

preponderance of the evidence. Once there is sufficient evidence to establish a violation of a community corrections sentence, the trial court has the authority to revoke the community corrections sentence. Tenn. Code Ann. § 40-36-106(e). The trial court may then "resentence the defendant to any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed, less any time actually served in any community-based alternative to incarceration." Tenn. Code Ann. § 40-36-106(e)(4).

The community corrections program was created as an alternative to incarceration that provides flexibility and promotes accountability, while reducing the number of "nonviolent felony offenders" in the state prison system. Tenn. Code Ann. § 40-36-104; see also State v. Estep, 854 S.W.2d 124, 126-27 (Tenn. Crim. App. 1992) ("[T]he community corrections sentence provides a desired degree of flexibility that may be both beneficial to the defendant yet serve legitimate societal purposes."). While the program provides defendants with freedom that would otherwise be removed if the defendant had been incarcerated, there are specific remedies available to the trial court to ensure that those who fail to comply with the program are sufficiently penalized for their noncompliance. Tenn. Code Ann. § 40-36-106(e)(4).

In rendering its decision to revoke the Defendant's sentence and order incarceration, the trial court in this case reasoned as follows:

> Now, the [c]ourt finds that upon this proof that [the Defendant] was living at this residence, by his own testimony. There was ammunition found in the residence. I understand the [d]efense argument that baggies and razors and straws can have other uses other than in connection with drugs. But I have to look at the totality of the circumstances. And certainly this [c]ourt is well aware of the fact that baggies and cut straws and razor blades are used in the sale of crack cocaine. It is drug paraphernalia whether residue was found on it or not. So, he had drug paraphernalia there. He had ammunition there. He was found with $501 that apparently fell out of his lap or his pocket or something when he stood up from the couch. And by the officer's testimony he said that Chico Echols had spent the night there. And this [c]ourt is well aware of who Chico Echols is and he is a person known to deal and sell drugs.
>
> The other thing I would note in terms of the argument -- and I understand what the [d]efense is saying -- in terms of the argument that he's not the kind of person who ought to have to go to prison, at least not yet, I understand the argument. And I understand that things they went searching for were not found. But, nevertheless, these things were found and he was on Community Corrections. And when you're on Community Corrections, that

means that you are a person who is appropriate to be put in prison but, nevertheless, you've been allowed to serve your sentence in the community. And this is the second violation.

Initially, we feel constrained to again note that the trial court needed only to find that a revocation of the Defendant's sentence was warranted by a preponderance of the evidence. Officer Romer testified that, during the search of the residence's closet, they found a "corner baggie," a cut straw, and two razor blades inside the Defendant's clothing. In Officer Romer's opinion, these items were commonly associated with the "use or sale of crack cocaine." Ammunition was also found in the closet. Cash, $501.00, was discovered on the Defendant's person when the officers entered the residence. The search warrant, which was introduced as an exhibit to the hearing, included a statement that items "consistent with the use and sale of crack cocaine and cocaine" had been found in the trash from the residence within the past seventy-two hours. Upon questioning, the Defendant told Officer Romer that Mr. Echols had spent the night at the residence before, and according to Officer Romer, it appeared that Mr. Echols visited the Defendant often. Several hours following the execution of the search warrant, Mr. Echols was found on the front porch at the Defendant's girlfriend's home.

The trial court did not believe the Defendant's explanations for these events. In a revocation hearing, the credibility of the witnesses is determined by the trial court. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). We may not disturb the trial court's finding in this regard. The trial court was within its discretion to determine that the Defendant violated the terms of his community corrections sentence by a preponderance of the evidence. The trial court further noted that this was the Defendant's second violation. Because there is substantial evidence that the Defendant violated the terms of his release, the trial court, pursuant to its discretionary authority, properly revoked the Defendant's community corrections sentence and ordered him to serve the balance of his sentence in confinement. See Tenn. Code Ann. § 40-36-106(e)(4). He is not entitled to relief.

## CONCLUSION

In sum, we conclude that the trial court did not abuse its discretion by revoking the Defendant's community corrections sentence and by ordering him to serve the balance of his original sentence in confinement. Accordingly, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-7-