# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 20, 2016

## STATE OF TENNESSEE v. JOSHUA SAMMY STEADMAN

**Appeal from the Criminal Court for Sullivan County**
**No. S60824     James F. Goodwin, Jr., Judge**

---

### No. E2015-00884-CCA-R3-CD – Filed March 3, 2016

---

The Defendant-Appellant, Joshua Sammy Steadman, appeals the trial court's order revoking his community corrections sentence. He argues that the trial court abused its discretion in revoking his community corrections sentence and ordering him to serve his original sentence in confinement. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Stephen M. Wallace, District Public Defender; and Ashley D. Boyer, Assistant Public Defender, Blountville, Tennessee, for the Defendant-Appellant, Joshua Sammy Steadman.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Barry P. Staubus, District Attorney General; and Teresa A. Nelson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On July 17, 2012, the Defendant was indicted for two counts of theft over $10,000, a Class C felony, and one count of theft over $1,000, a Class D felony. On October 5, 2012, the Defendant entered guilty pleas to all three theft counts charged in the indictment. As a Range II, multiple offender, he received an effective sentence of six years in the community corrections program and was ordered to pay court costs and restitution. The trial court ordered this sentence to be served consecutively to a prior

community corrections sentence that the Defendant was already serving.[1]  During the pendency of his first sentence, the Defendant pleaded guilty to a violation of community corrections, and his sentence in the present case was enhanced to ten years on community corrections, which became effective on July 18, 2014.  Under the terms of his community corrections supervision, the Defendant agreed to reside at the John R. Hay House Residential Treatment Facility (Hay House).  On January 6, 2015, a violation warrant was filed, alleging that the Defendant violated the conditions of his sentence by absconding from supervision without permission.  A two-part violation hearing took place on April 10 and April 20, 2015.

On April 10, 2015, Stuart Canter, the case developer at Hay House, testified that he was the Defendant's supervising community corrections officer for both sentences. Canter filed a violation report in the Defendant's first community corrections sentence, alleging that the Defendant had incurred new charges and failed to report.  The Defendant was arrested on that violation in February 2014, and he remained in custody until the expiration of his first sentence on July 18, 2014.  The Defendant returned to Hay House on July 22, 2014, to begin serving his current sentence.

The Defendant resided at Hay House until October 21, 2014, the day he was granted a medical furlough because his daughter was undergoing cancer treatment in Nashville.  He was allowed to live at home while on furlough but was specifically instructed to report in-person, twice a week to Joseph Harrigan, a Hay House in-house case officer.  The Defendant was also told to notify Harrigan when the Defendant traveled, to remain in contact with Harrigan while he was gone, and to follow-up with medical documentation once he returned.  Canter said that the Defendant did not provide his initial report until November 4, 2014, two weeks after he was granted medical furlough release.

On November 16, 2014, the Defendant was asked to provide medical documentation verifying that he had been out of town.  The Defendant said that he had already given it to a Hay House correctional officer; however, Harrigan was unable to locate the paperwork.  Canter emphasized that the Defendant had been instructed to submit his paperwork directly to Harrigan.  On December 5, 2014, the Defendant called Hay House to advise them that he had returned from Nashville and was told to submit his paperwork to Canter or Lucas Hensley, the facility's manager.  The Defendant did not report again until December 12, 2014, at which time Canter instructed him not to leave Hay House until his paperwork and reporting dates were confirmed.  The Defendant did not have the documentation he was asked to bring and refused to remain at Hay House. The Defendant reported to Harrigan on December 13 and December 14, 2015, and was

---

[1] We note that the date that the preceding sentence began is not borne out by the record.

advised on those days to remain at Hay House but refused to do so. The Defendant eventually brought paperwork verifying some of his daughter's appointments; however, there remained periods when the Defendant should have reported or called but failed to do so.

A violation report was filed in January 2015. Canter described the last phone conversation he had with the Defendant after the warrant was filed as follows:

> I believe it was probably sometime in either late January or early February and advised him that there had been a violation placed out for his arrest and he proceeded to tell me that his story that he had been doing what he was supposed to and I told him the file didn't reflect that. After questioning all the other officers nobody saw him, nobody took any information from him other than what information he brought in after I ordered him to be in residence.

On cross-examination, Canter testified that he had never dealt with the Defendant personally until December 2014. He explained that they tried to accommodate the Defendant's work schedule by allowing him to report directly to Harrigan, who mainly worked evenings. Canter acknowledged that, while Hay House clients are generally required to fill out a form every time they report, there were no forms in the Defendant's file even for the dates he did report. He agreed that the Defendant had no other way of verifying the dates he had reported besides relying on someone else to write down that he was there.

On recross-examination, Canter testified that he initially told the Defendant what the conditions of his furlough were in September 2014. Canter said that he later relayed the information regarding the furlough to Harrigan and that Harrigan actually did the furlough paperwork with the Defendant on October 21, 2014. He noted that the furlough agreement, which the Defendant signed, stated that the Defendant was required to report twice a week.

The Defendant testified that at his initial meeting to discuss the medical furlough, Harrigan told him to call once a week and bring in paperwork. The first furlough form he signed "was never twice a week." He said Canter informed him that he was supposed to report twice a week in November. After that, the Defendant said that he met with a correctional officer at Hay House the first of every week when Harrigan was not working. He insisted that these officers wrote his name in a log book on the dates he reported.

Although Canter told the Defendant to remain at Hay House over the weekend on December 12, 2014, the Defendant could not stay because he had not made arrangements for his sick daughter. The Defendant returned to Hay House the next day to give his medical documentation to Harrigan, and, at that time, Canter told Harrigan that the Defendant needed to remain in residence. The Defendant said that he told Harrigan that he could not stay because he needed to work and care for his sick daughter. Following this incident, the Defendant testified that he continued to report twice a week until sometime in January when he was told that he could no longer report due to a violation being filed against him. The Defendant said that this was the first he had heard of a violation. He insisted that he reported "twice a week every week since the December incident and before that . . . on the first of the week and the end of the week every week." He also said that he spoke with Harrigan "about every week" for the first couple of months of his furlough and that Harrigan knew about every trip he took to Nashville and every time he got back. In addition, he said he had spoken with Harrigan every other week even since the violation was filed. Regarding his medical documentation, he said that two weeks before meeting with Canter, he gave all of the paperwork to Hay House correctional officers to give to Harrigan.

On cross-examination, the Defendant testified that Canter initially told him that he would be granted a medical furlough but never discussed the conditions of the furlough with him. He said that Harrigan, not Canter, told him that, to accommodate his work schedule, he was to report to Harrigan. He also denied that Canter told him to report twice a week. However, he acknowledged that the medical furlough documentation he signed on October 21, 2014, clearly stated that he would report twice a week. The Defendant denied being told to report only to Harrigan and said that he had contact with several different Hay House workers. He agreed, however, that there was no documentation showing that he was seen by Harrigan or Canter twice a week as instructed. The Defendant also testified that he was never directed to turn himself in after the violation was submitted. He said that he talked with Harrigan several times about when the arrest warrant would be filed after he stopped reporting in January. He conceded that he knew of the violation and did not choose to turn himself in; however, he said that he "kept in contact" with Hay House until he was served in March.

On redirect examination, the Defendant testified that he did not turn himself in right away because his daughter had recently undergone surgery in Nashville. He also noted, "I've got two businesses out there, a family. I just got married. You know, I mean I had to try to get things situated. It's been hard. You know, I've tried to do the right thing."

Jeanette Steadman, the Defendant's wife, testified that she was with him several times when he reported to Hay House between July 2014 and January 2015. She did not

know the dates that she accompanied the Defendant. However, she said that she was with him "more than once a week" when he reported and that she sat in the car each time. She noted that she had previously talked with Harrigan about the Defendant's case and had maintained contact with Hay House.

Joseph Harrigan, the in-house case officer at Hay House, testified that he worked primarily evenings and his regular shift was Wednesday through Sunday from 4:00 p.m. until 12:00 a.m. In October 2014, Harrigan and Canter met with the Defendant about his medical furlough and instructed the Defendant to report to Harrigan twice a week. Harrigan said that he wrote down every time the Defendant reported or called and that the records kept in the Defendant's file accurately reflected his contact with the Defendant. On December 12, 2014, Canter told Harrigan that the Defendant needed to remain at Hay House until they could verify the Defendant's furlough documentation. Harrigan confirmed that the Defendant returned to Hay House but refused to stay. The Defendant attempted to report once sometime after December 14, 2014, but he could not recall the exact date. Harrigan told the Defendant he could no longer continue to report to him due to the violation. He did not tell the Defendant to turn himself in because no violation warrant had been issued.

On cross-examination, Harrigan agreed that he did not ever make the Defendant fill out a reporting form. However, he noted, "I know [the Defendant]. He's reported several times before. He was on Phase 2 of our program so I know . . . that he knew that was supposed to happen." Harrigan conceded that the Defendant relied on him to write down when he reported but insisted that, "any time [he] ever saw [the Defendant,] [he] wrote it down." He also said that all of the correctional officers on night shift at Hay House denied that the Defendant had ever reported to them.

At the close of the proof, the trial court reset the revocation hearing to April 20, 2015, to allow time for Canter and Harrigan to review all of the log book entries at Hay House. At the April 20 hearing, Canter testified that Hay House maintains in-house log books for residential clients only. At the request of the trial court, Canter reviewed every page of the log books as far back as October 2014. He said that "there was no entry whatsoever mentioning [the Defendant] reporting, calling or anything." He noted that Harrigan had also reviewed the books to verify that no entries were overlooked. On cross-examination, Canter stated that no other log books were used at Hay House.

The Defendant then testified that the log books he had previously referred to were "the officer's log books." He insisted that on either December 9 or December 10, 2014, he reported to Hay House and "Shell," a correctional officer, noted in a log book that he had reported. He also said that his phone records reflected that he called Hay House on February 27, 2015, for around ten minutes and on February 28, 2015, for around two

minutes.  His call log also showed two calls on March 3, 2015, one for three minutes and one for 35 seconds.

At the conclusion of the hearing, the trial court revoked the Defendant's community corrections sentence.  In doing so, the court stated:

> . . . [B]ut it's not a justification for not doing what he was told.  His problem . . . is that this is his second violation.  He was given a chance to do the right thing, to follow the rules of community corrections.  He violated that in his previous case and in this case[.] . . .  I understand that he's got issues with his family and I fully understand that he's worried about his daughter but I don't think he's been entirely truthful with me.  The whole reason we're here today and that I didn't issue a ruling on the 10th was that he was adamant that there were logs that he signed in.  Hay House personnel has searched.  They've not found any evidence of that at all and then he gets back on the witness stand and I don't know if it's to his credit or to his detriment but he insists that there's another set of log books that apparently Mr. Canter and the Hay House staff doesn't know about that he signed in.  . . . [H]e did abscond from supervision because he wasn't at Hay House and he wasn't following the rules that they told him to do.  All right, so just because he didn't leave Sullivan County and just because . . . everybody in this courtroom feels for his daughter and for his family situation but the best way he could have taken care of his daughter was to have followed the rules.  All they asked him to do if he was going to be in Nashville to call in and the proof was that he didn't do that, that he would go for long periods of time.  He was supposed to check in on a certain interval and he didn't do it and based on all the proof that I've heard and considering all the factors that I have to consider I don't like it but he's going to have to serve his sentence[.]

On May 13, 2015, the trial court issued a written revocation order crediting the Defendant for time served and ordering that he serve the remainder of his sentence in confinement.  It is from this order that the Defendant now timely appeals.

## ANALYSIS

The Defendant argues that the trial court abused its discretion in revoking his community corrections sentence because there was no substantial evidence that a violation had occurred.  He maintains that Hay House failed to follow proper protocol and that he "followed the instructions given to him as best that he could possibly."  In

response, the State contends, and we agree, that the trial court acted within its discretion in revoking the Defendant's community corrections sentence.

The Tennessee Supreme Court has held that the same principles that apply in the revocation of probation also apply in the revocation of community corrections. State v. Harkins, 811 S.W.2d 79, 83 (Tenn. 1991). The revocation of community corrections, like the revocation of probation, rests within the sound discretion of the trial court. Id. A trial court may revoke either alternative sentence upon a finding by a preponderance of the evidence that the defendant violated the conditions of the sentence. See T.C.A. §§ 40-35-310, -311(e). An appellate court will uphold a trial court's decision to revoke probation or community corrections absent an abuse of discretion. State v. Beard, 189 S.W.3d 730, 735 (Tenn. Crim. App. 2005); State v. Webb, 130 S.W.3d 799, 842 (Tenn. Crim. App. 2003) (quoting Harkins, 811 S.W.2d at 82). An abuse of discretion is established if the record is devoid of substantial evidence to support the conclusion that a violation of probation has occurred. State v. Leach, 914 S.W.2d 104, 106 (Tenn. Crim. App. 1995) (citing Harkins, 811 S.W.2d at 82). Once the trial court decides to revoke a defendant's probation, it may (1) order confinement; (2) order the sentence into execution as initially entered, or, in other words, begin the probationary sentence anew; (3) return the defendant to probation on modified conditions as necessary; or (4) extend the probationary period by up to two years. See State v. Hunter, 1 S.W.3d 643, 647 (Tenn. 1999) (citations omitted); State v. Larry Lee Robertson, No. M2012-02128-CCA-R3CD, 2013 WL 1136588, at *2 (Tenn. Crim. App. Mar, 19, 2013); State v. Christopher Burress, No. E2012-00861-CCA-R3-CD, 2013 WL 1097809, at *6 (Tenn. Crim. App. Mar. 18, 2013); T.C.A. §§ 40-35-308, -310, -311 (2012). The trial court determines the credibility of the witnesses in a probation revocation hearing. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991) (citing Carver v. State, 570 S.W.2d 872 (Tenn. Crim. App. 1978)).

The Defendant argues that the evidence did not adequately support the trial court's revocation of his community correction supervision. Upon reporting to Hay House, he was never required to fill out the required documentation and insists that "[t]his lack of protocol casts a shadow on the Hay House procedure[.]" He emphasizes that he was caring for his sick daughter and that he "attempted to report as best that he could" under the circumstances. Based on our review of the record, we conclude that the trial court did not abuse its discretion in finding that the Defendant violated the conditions of his community corrections sentence and ordering him to serve the remainder of his sentence in confinement.

The record shows that on October 21, 2014, the Defendant was granted a medical furlough. At that time, he signed an agreement stating that he would report to Hay House twice a week or, if out of town, call in and follow up with medical documentation. Both

supervisors at Hay House testified that, between October 21 and December 12, 2014, the Defendant reported or called three times. On December 12, 2014, Canter ordered the Defendant to remain in residence at Hay House until his reporting dates and medical paperwork could be verified. The Defendant failed to do so. On December 13 and 14, the Defendant was again advised by Harrigan to remain at Hay House but chose to leave. After December 14, 2014, the Defendant did not report to Hay House again until sometime in January, at which time he was informed that a violation had been submitted. Canter and Harrigan both testified that, aside from one subsequent phone call, they did not hear from the Defendant again until he was served with an arrest warrant on March 4, 2015. We certainly sympathize with the Defendant's situation and his sick child, as did the trial court. In an effort to give the Defendant's testimony credence, the trial court continued the hearing and ordered Hay House personnel to search their log books, consistent with the Defendant's testimony regarding his reports. After their search proved fruitless, the Defendant insisted there was another set of books. As noted by the trial court, the Defendant was given the benefit of alternative sentencing in two different cases and Hay House made significant efforts to accommodate his schedule and family needs. Yet, he failed to abide by the minimal requirements stated in his medical furlough agreement and repeatedly disregarded the instructions of Hay House case managers. The trial court acted within its authority in revoking the Defendant's community corrections sentence and imposing confinement. The Defendant is not entitled to relief.

## CONCLUSION

For the aforementioned reasons, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE